Sami LEKA, Petitioner,

v.

Leonardo PORTUONDO, Superintendent Shawangunk Correctional Facility, Respondent.

No. CIV.A. 97–CV–2061 (DGT).

United States District Court,
E.D. New York.

Nov. 30, 1999.

Memorandum on Reconsideration
Dec. 30, 1999.

Sami Leka, Wallkill, NY, Pro se.

Michael S. Sommer, McDermott, Will & Emery, New York City, for Petitioner.

Charles J. Hynes Kings County District Attorney by Michael Gore, Brooklyn, NY, for Respondent.

### REVISED MEMORANDUM AND ORDER

TRAGER, District Judge.

Petitioner Sami Leka is currently in the custody of New York State prison officials pursuant to a 1990 conviction on second degree murder and weapons charges. Asserting actual innocence, Leka petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that the police investigation and state court proceedings leading to his conviction violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. First, Leka argues that he was convicted partly as a result of impermissibly suggestive police identification procedures. Second, he alleges that the prosecution suppressed material evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Lastly, petitioner alleges that he was denied his Sixth Amendment right to the effective assistance of trial counsel.

## Background

### (1)

On the evening of February 12, 1988, at approximately 6:00 p.m., Rahman Ferati was shot eight times in the legs, chest, hand, and back as he stood in front of 1954 Ocean Avenue, between Avenues N and O, in Brooklyn, New York. Although an ambulance reached the scene within ten minutes of the shooting, efforts to save Ferati were unsuccessful, and he was pronounced dead at Coney Island Hospital at 6:43 p.m. Officers of the New York Police Department responded to the scene and, as part of their investigation, identified witnesses to the shooting. The witnesses included two passers-by, Elfren Torres ("Torres") and his then-girlfriend (now-wife) Carolyn Modica Torres ("Modica"). Torres told Sergeant Thomas Mahony that he had seen two men and a light-colored car. Modica told Sergeant Mahony that she had seen someone in a car prior to the shooting and would be able to recognize him if she saw him again. Modica then gave the officer their names and address, and the couple returned to their nearby home.

That evening, Modica and Torres discussed what they had seen with one another. Around midnight, two detectives came to the Torres' home and asked them to come to the 70th Precinct station. Torres and Modica asked whether they could come in the morning, but when they were told that the matter was urgent, agreed to accompany the detectives.

Once at the precinct house, the police separated Modica and Torres. Modica provided detectives with a description and a drawing of the man she had seen in the light-colored car, and gave a tape-recorded statement to an assistant district attorney.[1] At around 4:45 a.m., Detective Pedro Vergara showed Modica two photo arrays. Each array consisted of six photographs arranged in two horizontal rows of three photographs each. The first array included a photograph of Zeni Cira, a man who would later be tried along with petitioner for the murder of Ferati and acquitted, but who, after his acquittal, would confess to the murder. Each of the men included in the first array, including Zeni Cira, was pictured without a mustache. Modica did not identify anyone from that photo array. The second photo array included a photograph of Leka, and each of the men in the second array, including Leka, was pictured wearing a mustache. From this array, Modica identified Leka as the man she had seen in a car at the crime scene. Modica remarked to the detective that petitioner had appeared fifteen pounds heavier at the scene, but explained that petitioner had been wearing a bulky black leather jacket that made him appear bigger.

At about 1:30 a.m., Torres gave a statement to a Detective Lee (first name unknown). Torres explained that he and Modica had walked by a light-colored car and, after passing it, heard two shots. Torres turned and saw a hand holding a gun extended out of the passenger-side window of the car. Torres ducked down but quickly looked up again and saw a man outside the car shooting in a downward direction at a man in the street. At some point thereafter, Torres and Modica ran into a building. Torres stated that he did not see the car leave. Torres described the man he had seen shooting as five feet, nine inches tall, medium build, in his late twenties or early thirties, dark hair, mustached, wearing a dark leather coat, and firing a black revolver with a brown handle.

At 5:10 a.m., Detective Vergara showed Torres the same two photo arrays that had been shown to Modica. Torres did not select anyone out of the first photo array but selected petitioner from the second photo array. The police then drove Modica and Torres home.

The police apparently had Leka's photograph due to a 1977 arrest, but it is not clear why his picture was included in an

1. *See* Transcript of Trial at 521–22 [hereinafter T.].

array shown to Torres and Modica so soon after the crime. At trial, Detective Vergara testified that he was aware that the victim and the alleged perpetrators were Albanians, but he did not know how petitioner's name became involved in the investigation; nor was Detective Vergara aware of petitioner's name until he was handed the photo array at the precinct house.[2]

In any event, the police followed up on the identification of petitioner by Torres and Modica. Detective Vergara and Detective James Sanseverino went to petitioner's apartment around 6:15 a.m. on February 13th. A woman answered the door and told the police that petitioner was not there. Detective Sanseverino spoke to petitioner later that same day when petitioner voluntarily came to the precinct. Petitioner explained that he had been home when the detectives had come to his apartment, but that he had been asleep. He also told Detective Sanseverino that around 6:30 p.m. or 7:00 p.m. of the preceding evening he had gone out with his sister-in-law Naze Alijaj to rent a videotape and that he had bought snacks while his sister-in-law rented the videotape.[3] Petitioner could not remember the name of the movie. In addition, petitioner claimed that he had borrowed his brother's Camaro and had driven around Manhattan for three hours between 11:00 p.m. on the 12th and 2:00 a.m. on the 13th.[4]

On March 8, 1988, the police again brought Torres and Modica to the 70th Precinct house and had them separately view a line up which included petitioner. Again, both Modica and Torres independently identified petitioner as the man they had seen on the night of the shooting. Following the identification, petitioner was arrested.

The final important pre-trial event for purposes of this petition was a *Wade* hearing[5] held on February 20th and 21th, 1990, before Justice Philip E. Lagana of the New York Supreme Court, Kings County. The prosecution called three witnesses, Modica, Torres and Detective Vergara, to rebut charges that the police engaged in suggestive conduct that resulted in Modica and Torres' identifications of petitioner. The defense called no witnesses of its own, but it did assemble an in-court line up consisting of petitioner, Zeni Cira's brother Luftim (who would testify at trial that he and another brother, Osman, murdered Ferati in self-defense), and six other Albanians, including relatives of both Zeni Cira and petitioner.[6] The prosecutor asked Modica and Torres each to identify the individual they had seen at the crime scene from the line up assembled by the defense, and without hesitation both selected the petitioner. Petitioner's trial counsel, Joseph Benfante, cross-examined the three witnesses extensively in an unsuccessful effort to show that the police had engaged in some form of misconduct or had pressured Torres and Modica to identify petitioner.

At the close of the *Wade* hearing, the state trial court denied a motion by petitioner to adjourn the trial until all the police officers who had assembled the photo arrays or who had been in contact with either Modica or Torres could be identified, subpoenaed, and examined by the

---

**2.** During a pre-trial motion argument, the assistant district attorney prosecuting the case represented to the trial judge that the police had recounted the Torres' descriptions of the gunman to "one of the family members," who then identified Leka as someone who fit that description. T. 65–66.

**3.** *See* T. 1660, 1666–68. Leka's sister-in-law did not testify at trial.

**4.** During the interview, petitioner also mentioned that he had arthritis. Petitioner's trial

counsel would later argue that Leka's arthritis was in fact so severe that Leka was incapable of committing the crime.

**5.** *See United States v. Wade*, 388 U.S. 218, 241–42, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**6.** *See* Transcript of *Wade* Hearing held Feb. 20–21, 1990, at 13–16 [hereinafter W.].

defense. The court did, however, state that it would re-open the hearing if petitioner could find any police officer whose testimony was helpful in his attack on the pre-trial identifications. The court also rejected a defense motion to hold a hearing on whether Modica and Torres had a reliable independent source for their line up identifications. The defense predicated this latter motion on the ground that the photo array was inherently suggestive because the five other pictures in the array were allegedly of Hispanic men, while petitioner was an Eastern European. There was (and is), however, no evidence in the record regarding the actual ethnicities of the photo array fill-ins.

### (2)

Petitioner's trial began with jury selection on February 26, 1990. The prosecution's case detailed the intra- and inter-family feud which allegedly provided the motive for the shooting. The victim, Rahman Ferati, was related to the Ciras through the marriage of his son Veli to Zeni Cira's sister Lydia, and through the marriage of his daughter Julie to Zeni Cira's brother Luftim. After Veli's death in an automobile accident in 1978, Ferati took custody of Veli and Lydia's children. In 1986, Ferati moved from New York to Houston, Texas, taking the grandchildren with him. In 1987, during a period in which Ferati was incarcerated, the Cira family regained custody of the children and brought them back to Brooklyn. Losing custody of his grandchildren angered Ferati greatly. Around New Year's, 1988, Ferati returned to New York and took up residence with his daughter Julie, her husband, Luftim Cira, and their children. Soon thereafter, tension developed between Ferati and his son-in-law. On February 11, 1988, matters came to a head when Ferati forced his daughter and her children to leave their home and held them against their will in his brother Sali's apartment at 1947 Ocean Avenue. Ferati supposedly took this action as a quid pro quo against the Ciras for taking Veli's children. The very next day, Rahman Ferati was shot to death across the street from Sali's apartment. Petitioner was nominally an ally of the Ciras in their feud with the Feratis because his sister was married to his co-defendant, Zeni Cira. No additional explanation was offered as to what motive petitioner had to murder Ferati.

The prosecution's direct case against petitioner consisted almost entirely of the eyewitness identification testimony of Torres and Modica. Torres testified to essentially the same account of the shooting that he had given to Detective Lee on the night of the shooting, and he also made an in-court identification of the petitioner.

Modica testified that around 6:00 p.m. on February 12, 1988, she and Torres had been walking along Ocean Avenue in the direction of Avenue N when she noticed two men sitting in a light-colored car that was double-parked in front of a psychoanalyst's office at 1954 Ocean Avenue. As Modica passed the car, it seemed to her that the man in the passenger seat was looking toward her and whispering something to his companion about her. Modica, whose nose was bandaged due plastic surgery she had just had a week earlier, believed the two men were mocking her, and she therefore stared back as she walked past the car.

Modica testified that, in all, she stared at the man in the passenger seat for "[m]aybe about four seconds, five seconds."[7] Although Modica testified that she was not able to see the driver's face, she was able to describe the passenger:

He had like a medium olive complexion, but it didn't have any sort of a yellowish cast to it or anything. And he had very dark brown or black hair. And it was like that D.A. disco type of style that he had. And he had on a black leather jacket. And it had padding, you know,

---

7. T. 388.

like one of those bulky business black leather jackets.[8]

Modica added that the man in the passenger seat had a full, thick mustache. Modica then identified the petitioner as the man she had seen in the passenger seat of the light-colored car. Modica concluded her account of the shooting by testifying that, after she and Torres passed the car, they continued walking for what she estimated to be "about five car lengths" when she heard gunshots.[9] Modica then ducked down behind a parked car and some garbage cans until the shooting stopped and Torres told her that the car was leaving.

In its case against petitioner's co-defendant, Zeni Cira, the prosecution introduced into evidence a dying declaration Rahman Ferati made to his brother Sali. In response to Sali asking who had shot him, Rahman replied, "Zeni, Zeni, Zeni," while moving his hand in a manner that Sali believed was meant to indicate Zeni Cira was driving the car. Rahman Ferati was apparently unable to recognize anyone else in the car, although the Ferati family had known petitioner for many years.

The prosecution also introduced ballistics evidence showing that a gun recovered from a sewer located near petitioner's apartment was the gun that had fired the bullets that had killed Rahman Ferati.[10] In addition, Assistant Medical Examiner Dr. Marie Macajoux, who performed Ferati's autopsy, testified that some of the bullet wounds were consistent with the victim lying on his back, and someone standing four to six feet away, shooting downward.

Neither petitioner nor his co-defendant testified at trial.[11] Instead, petitioner's defense consisted of attacks on Torres and Modica's identifications, buttressed by meteorological evidence which suggested the lighting conditions at the crime scene were poor [12] and by witnesses who testified that petitioner had never worn a mustache or at least had not worn a mustache since 1978.[13]

Petitioner also presented an alternate account of the murder, namely that Luftim Cira shot Ferati in self-defense while attempting to get his family back from Ferati. Luftim Cira testified that he had seen his brother, Osman, by chance and had Osman drive him to Sali Ferati's apart-

---

8. T. 380.

9. T. 383.

10. Police retrieved the gun after being advised of its location by Luftim Cira, *see* T. 820, who later confessed to the murder at trial.

11. At the *Wade* hearing, petitioner's trial counsel moved to exclude evidence of petitioner's prior arrests—a 1976 misdemeanor weapons charge and a 1977 disorderly conduct charge—in the event Leka decided to testify. The court granted the motion subject to the condition that Leka not misrepresent himself as having a spotless record. *See* W. 212.

12. Modica, Torres, Sergeant Mahony, and Detective Vergara testified that there was only a light drizzle at the time of the shooting and that there was still some light out. Petitioner introduced weather reports intended to prove that the weather conditions and visibility at the time of the shooting were substantially worse. First, U.S. Naval Observatory calcula-

tions indicated that on February 12, 1988, sunset occurred in Brooklyn at 5:26 p.m. and that "civil twilight" (i.e., the time at which the sun is six degrees below the horizon) occurred at 5:55 p.m. In addition, records from the Central Park weather station indicated it was raining and snowing between 6:00 p.m. and 7:00 p.m. Finally, Detective Vergara's notes from the crime scene indicated "hail, snow, and drizzle." T. 847. Petitioner's trial counsel also elicited testimony on cross-examination that he argued further supported a theory of poor visibility at the time of the shooting, viz., that the street lights were already on and that Torres was able to see muzzle flashes when the gun was fired.

13. In addition, on cross-examination of Detective Sanseverino, petitioner's counsel elicited testimony that when Leka came to the precinct house the day after the shooting, he had no mustache and told Detective Sanseverino that he had not had one since 1976 or 1977. Petitioner also introduced a certified copy of a Texas driver's license issued to him on November 3, 1987, which showed him without a mustache.

ment. As they drove up, they spotted Rahman Ferati on the side of the street. When, on Luftim's instruction, Osman stopped the car beside Rahman, Rahman allegedly began cursing Luftim and pulled out a gun. Luftim drew his own weapon and exchanged fire with Ferati through the passenger side window of the car.[14] Luftim testified that he never left the car[15] and that, after the shooting, he and Osman sped away. Subsequently, Luftim and Osman split up, and Luftim proceeded on foot. While walking towards his older sister's house, he threw his gun in the sewer where detectives later recovered it. In support of the self-defense aspect of Luftim's account, various defense witnesses testified that Rahman Ferati was known to be a violent and dangerous man who regularly carried a gun.

The final component of petitioner's trial defense consisted of calling petitioner's friend and two neighbors/in-laws to testify that petitioner was essentially incapacitated by arthritis at the time of the murder. Petitioner also introduced medical records from Coney Island Hospital, which indicated that Leka had visited its outpatient clinic on February 2nd and February 10th of 1988, complaining of swollen fingers and pain in the back, shoulder, and left knee. The records further showed that Leka had reported a six- to seven-year history of arthritis.[16] Through this evidence, petitioner sought to create the inference that he was physically incapable of committing the murder.

On rebuttal, Detective Vergara was asked to indicate on a map the relative locations of the murder scene, 1954 Ocean Avenue, the sewer where the murder weapon was found, 1657 Ocean Parkway, and Leka's apartment, 209 Avenue P. The prosecution apparently sought to suggest that, since the sewer was only about one block away from Leka's apartment, it was more likely that Leka had dropped the gun there than had Luftim Cira. Based on his review of police log books, Detective Vergara also testified that no police officers or detectives visited Leka's apartment building on the night of February 12th and that two sets of detectives left the precinct house at 3:10 a.m. and 4:10 a.m. on February 13th, respectively, to obtain a photograph of Leka. This testimony contradicted testimony given by Leka's two neighbors/in-laws that the police had come to their apartment at 9:30 p.m. on the 12th and showed them a picture of Leka with a mustache. Finally, Detective Sanseverino recounted the alibi petitioner had given to the police, viz., that he had been out renting a movie and buying snacks at the time of the murder, which contradicted the testimony of the neighbors and friend that petitioner was too sick on the day of the murder to leave the house or get out of bed.

(3)

On the morning of March 26, 1990, the jury was charged. After several readbacks of the transcript, supplemental in-

---

**14.** On cross-examination, Luftim Cira was unable to say whether his arm was sticking out from the car window, how many times he shot Ferati, or in what places on the body. Luftim explained that he had "no idea" because he panicked and shot Ferati with his eyes closed or perhaps half-closed. *See* T. 1504–15. After the trial, Luftim recanted his testimony and stated that he was driving the car and that Zeni Cira—petitioner's acquitted co-defendant—had shot Ferati. *See* Luftim Cira Aff., Pet.'s Mem., Ex. 15.

**15.** Assistant Medical Examiner Macajoux was never specifically asked and never stated whether any of Ferati's wounds were incon-

sistent with all of the shots having been fired from the window of a car.

**16.** X-rays taken of Leka's knees, hands, and shoulders on February 10th showed no indication of rheumatoid arthritis, osteoarthritis, or any other abnormality of the bones or joints, aside from an old fracture of the right thumb. Nonetheless, the treating physician diagnosed possible rheumatoid arthritis and prescribed a non-steroidal anti-inflammatory drug. A February 18th appointment at the hospital's arthritis clinic was scheduled for Leka, but there is no record that Leka kept the appointment.

structions, and a deadlock at one point as to both defendants, the jury returned with a unanimous verdict on the evening of March 28, 1990, finding petitioner guilty of Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. The jury acquitted Zeni Cira on all charges.

(4)

After the verdict, petitioner retained new counsel and began a series of state court proceedings aimed at overturning the jury's verdict. Less than eight weeks after the verdict, on May 18, 1990, petitioner filed a motion under N.Y. C.P.L. § 330.30 for an order setting aside the verdict due to newly discovered evidence and ineffective assistance of counsel. The newly discovered evidence consisted mainly of Zeni Cira's videotaped confession that he shot Rahman Ferati and that his brother Luftim drove the car. Petitioner alleged ineffective assistance of counsel due to a conflict of interest stemming from Zeni Cira's payment of petitioner's legal fees.[17] On May 31, 1990, the state trial court denied petitioner's motion without a hearing [18] and sentenced Leka to concurrent, indeterminate terms of imprisonment of twenty years to life on his conviction for Murder in the Second Degree, five to fifteen years on his conviction for Criminal Possession of a Weapon in the Second Degree, and two and one-third to seven years on his conviction for Criminal Possession of a Weapon in the Third Degree. On June 18, 1990, petitioner filed a notice of appeal from the denial of the § 330.30 motion. Leka subsequently appealed from his judgment of conviction to the New York Supreme Court, Appellate Division, Second Department (the "Appellate Division").

On February 8, 1991, petitioner moved the trial court for an order vacating the judgment of conviction under N.Y. C.P.L. § 440.10. Petition repeated the same claims he advanced in his § 330.30 motion, but he submitted additional newly discovered evidence, including the evidence at the heart of the petition now before this court—affidavits in which Torres recants, and both he and Modica cast doubt on, their trial testimony.

In his affidavit, Torres claimed that he was pressured to identify petitioner as the shooter and that detectives led him to believe that petitioner was in fact the shooter. *See* Elfren Torres Aff. of 1/2/91, ¶ 5, Pet.'s Mem., Ex. 7 [hereinafter Torres 1991 Aff.]. Torres recanted his trial testimony, alleging that he had only seen shots fired from the car and that the only person he had seen outside the car was Rahman Ferati. *See id.* ¶ 6.

In contrast, Modica did not actually recant her identification of petitioner. In her affidavit, Modica stated that, based on information supplied to her by petitioner's then-counsel Stephen G. Murphy, it was "possible" that the double-parked car she had seen drove off after she passed by:

3. ... Mr. Murphy explained to me that the car I saw (in which I identified MR. LEKA as a passenger) had already pulled out and that the car the murderer was in was seen pulling up double parked and shooting by a bus driver.

4. This makes me feel that it is possible that it was a different light/white

---

**17.** There is no indication that the state trial court was aware or should have been aware that Zeni Cira paid petitioner's legal fees at any time prior to the trial. *See Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980) (holding that a trial court has an obligation to inquire into the facts and circumstances of an attorney's interests when it knows or reasonably should know of the possibility of a conflict of interest); *United States v. Stantini*, 85 F.3d 9, 13

(2d Cir.1996) (same). Benfante had represented both petitioner and Zeni Cira until their cases were consolidated for trial, at which point Cira retained another lawyer who shared office space with Benfante, John H. Jacobs. Cira, however, continued to pay Benfante for his representation of Leka.

**18.** *See* Transcript of Sentencing Hearing held on May 31, 1990, at 21.

car I saw with a passenger who looked like SAMI LEKA by coincidence. That there is a realistic possibility that as we walked by, the car I saw pulled away, and another similar car pulled in.

Carolyn Modica Torres Aff. ¶¶ 3–4, Pet.'s Mem., Ex. 8 [hereinafter Modica Aff.]. In a handwritten addendum to the affidavit, Modica clarified that her "recantation" was predicated on Murphy's factual representations and indicated that she nonetheless continued to believe that the man she had seen resembled Leka:

In conclusion after obtaining the other information given to me by Mr. Murphy & [Murphy's investigator] and after my discussion of the events on the day in question, I cannot honestly say I am positive that Mr. Leka was the man in the car I passed—Its [sic] possible to have been someone who had his style of hair (DA) and coloring with brown eyes.

*Id.* ¶ 7.

With his § 440.10 motion, petitioner also presented affidavits from three other witnesses to the murder, as well as grand jury testimony from one of those witnesses and a police interview report from another.[19] This evidence, he argued, showed that no one got out of the car during the shooting. Although this evidence would not directly exculpate petitioner, since none of these three witnesses could conclusively state that petitioner was not in the car or at the scene, petitioner argued that it impeached Torres' testimony and cast doubt upon the time line, position of the car, and sequence of events to which Torres and Modica testified.

In a written opinion, the state trial court concluded that the evidence offered by petitioner did not meet the state law criteria

for granting a new trial and denied petitioner's motion to set aside the judgment. *See People v. Leka*, Indict. 2520/1988 (N.Y. Sup.Ct., Kings County, Dec. 6, 1991) (corrected order denying § 440.10 motion at 8) [hereinafter Section 440.10 Opinion].

On November 6, 1991, petitioner requested leave to appeal the denial of his § 440.10 motion and to consolidate that appeal with his direct appeal and his appeal from the trial court's denial of his § 330.30 motion. On February 18, 1992, the Appellate Division granted petitioner's motion and consolidated all three appeals. Petitioner, represented by yet another lawyer, raised three claims on the consolidated appeal. First, he argued that the verdict was against the weight of the evidence. *See* Pet.'s App. Mem. at 30–36. Second, the trial court erred in denying petitioner's pre-trial motion to suppress the identification testimony because the photo array shown to Torres and Modica on the morning after the shooting was impermissibly suggestive. *See id.* at 37–42. Lastly, petitioner challenged the denial without a hearing of his § 330.30 and § 440.10 motions, essentially repeating the arguments he had made to the trial court. *See id.* at 43–79.

On November 28, 1994, a unanimous panel of the Appellate Division affirmed petitioner's conviction. *See People v. Leka*, 209 A.D.2d 723, 619 N.Y.S.2d 144 (2d Dep't 1994) (per curiam). The Appellate Division concluded that the photo array was not suggestive because all the subjects were sufficiently similar in appearance to petitioner. The Appellate Division further held that the trial court had properly denied Leka's post-trial motions.[20]

**19.** Anthony Chiusano Aff., Pet.'s Mem., Ex. 5; Wilfredo Garcia Aff., Pet.'s Mem., Ex. 4 [hereinafter Garcia Aff.]; Jose Gonzalez Aff., Pet.'s Mem., Ex. 6; Transcript of Jose Gonzalez Grand Jury Testimony, Pet.'s Supp. Mem., Ex. 4 [hereinafter Gonzalez Grand Jury]; Complaint–Follow Up Informational of Anthony "Cansano" dated 2/18/88, Pet.'s Supp. Mem., Ex. 5 [hereinafter Chiusano DD–5].

**20.** The Appellate Division pointed out that, under the New York Criminal Procedure Law, the trial court erred in hearing petitioner's claims of ineffective assistance of counsel and newly discovered evidence as part of petitioner's § 330.30 motion because those claims were based on evidence and matters outside the record. *See Leka*, 209 A.D.2d at 724–25, 619 N.Y.S.2d at 146 (noting that the claims

On March 14, 1995, the New York Court of Appeals denied petitioner leave to appeal. *See People v. Leka,* 85 N.Y.2d 911, 627 N.Y.S.2d 334, 650 N.E.2d 1336 (1995).

### (5)

On April 21, 1997, petitioner, acting pro se, filed this petition for a writ of habeas corpus. The State of New York moved to dismiss the petition on the grounds that it fell outside the one-year statute of limitations prescribed by the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244(d)(1) (Supp.1999) ("AEDPA"). This court denied the motion. *See Leka v. Portuondo,* No. CV–97–2061 (DGT) (E.D.N.Y. Sept. 26, 1997) (order denying motion to dismiss). On February 6, 1998, the petitioner's motion for appointment of counsel was granted, but the court was notified shortly thereafter that the firm of McDermott, Will & Emery would represent petitioner.

### Discussion

Petitioner raises three claims in support of this petition. First, he attacks the police identification procedures as impermissibly suggestive. Second, he alleges that the prosecution concealed and/or delayed disclosure of *Brady* material. Finally, petitioner argues that he received ineffective assistance of counsel at trial.

### (1)

Petitioner's claim that the police used impermissibly suggestive identification procedures raises two distinct issues: first, whether the composition of the photo array was inherently suggestive, and, second, whether police pressured Torres to

should have been disposed of only under petitioner's § 440.10 motion). The Appellate Division, however, went on to reject both the ineffective assistance and newly discovered evidence claims on the merits. *See id.* at 725, 619 N.Y.S.2d at 146.

**21.** There is currently a split between the circuit courts over the interpretation of § 2254(d)(1). *Compare Drinkard v. Johnson,* 97 F.3d 751, 767 (5th Cir.1996) (holding that the "contrary to" language of § 2254(d)(1) applies to pure questions of law, while the "unreasonable application of" language ap-

pick Leka from the photo array. As discussed below, petitioner cannot be granted a writ with respect to either theory of tainted identification.

### a. The Photo Array

Petitioner argues that the photo array that included petitioner's photograph was inherently suggestive because he was the only Albanian pictured in the array, while the rest of the photographs were of Hispanics. Petitioner further contends that Modica and Torres's subsequent in-person identifications of the petitioner at the precinct house line up, at the *Wade* hearing, and at trial, were all irreparably tainted by the suggestive photo array, and should have been excluded from evidence.

 Whether a pre-trial identification procedure, such as a photo array, is so suggestive that it denies a defendant due process is a mixed question of law and fact. *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam). Because petitioner's argument was fairly presented to the state courts and adjudicated on the merits, both by the trial court, *see* W. 205, 210–11, and by the Appellate Division, *see Leka,* 209 A.D.2d at 724, 619 N.Y.S.2d at 145–46, the state courts' rejection of petitioner's claim can be overturned on federal habeas review only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (Supp. 1999).[21]

plies to mixed questions of law and fact), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), *and Hennon v. Cooper,* 109 F.3d 330, 334 (7th Cir.) (same), *cert. denied,* 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997), *and Neelley v. Nagle,* 138 F.3d 917, 923–24 (11th Cir.1998) (same), *cert. denied,* — U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999), *with O'Brien v. Dubois,* 145 F.3d 16, 22 (1st Cir.1998) (applying the "contrary to" prong to both pure legal and mixed questions where the Supreme Court has "prescribed a rule that gov-

The Supreme Court has established a two-part inquiry for evaluating in-court identification testimony based on pre-trial identification procedures. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The inquiry "rè-

erns the petitioner's claim," and applying the "unreasonable application of" prong to state court derivations of a new rule from existing precedent), *and Matteo v. Superintendent,* 171 F.3d 877, 888 (3d Cir.1999) (en banc) (same), *cert. denied,* ⸺ U.S. ⸺, 120 S.Ct. 73, ⸺ L.Ed.2d ⸺ (1999), *with Williams v. Taylor,* 163 F.3d 860, 865 (4th Cir.1998) (employing a hybrid approach in which the "unreasonable application of" prong is construed to encompass both the derivation of new rules of decision from existing precedent and the application of established precedent to the facts of the particular case at bar), *cert. granted,* ⸺ U.S. ⸺, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999). The Supreme Court has granted certiorari in *Williams v. Taylor* to resolve the issue, and the Second Circuit has thus far declined to pass on the construction of § 2254(d)(1). *See Smalls v. Batista,* 191 F.3d 272, 278 n. 5 (2d Cir.1999).

Resolution of petitioner's claim, however, does not require a decision on the interpretation of § 2254(d)(1). On the facts of this case, the analysis of petitioner's claim would proceed in substantially the same fashion under either of the two approaches taken by circuit courts to § 2254(d)(1). Although there are nuance differences between the analyses employed by the Fifth, Seventh, and Eleventh Circuits, *compare, e.g., Drinkard,* 97 F.3d at 769 (holding that an application of federal law is "unreasonable" only if the resulting decision is "so clearly incorrect that it would not be debatable among reasonable jurists"), *with Hennon,* 109 F.3d at 335 (holding that application is not "unreasonable" as long as the decision is "at least minimally consistent with the facts and circumstances of the case"), as a general matter, each of these circuits would review a state court determination of a mixed question of law and fact, such as that presented by petitioner's tainted identification claim, by looking to the facts of the case and relevant Supreme Court precedent to determine whether the state court's decision resulted from an "unreasonable application" of that precedent to the facts.

On the other hand, the First and Third Circuits review state court determinations of mixed questions of law and fact in cases, such as petitioner's, where applicable Supreme Court rules of decision exist under the "contrary to" prong of § 2254(d)(1). The First

quires [1] a determination of whether the identification process was impermissibly suggestive, and if so, [2] whether it was so suggestive as to raise a 'very substantial likelihood of irreparable misidentification.' " *Id.* at 196, 93 S.Ct. at 380 (quoting

and Third Circuits have explained that in order to show that a state court determination of a mixed question of law and fact is "contrary to" clearly established federal law:

A petitioner need not point a habeas court to a factually identical precedent. Oftentimes, Supreme Court holdings are "general" in the sense that they erect a framework specifically intended for application to variant factual situations. These rules sufficiently shape the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s "contrary to" prong.

\* \* \* \* \* \*

[T]he key inquiry, at bottom, is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.

*O'Brien,* 145 F.3d at 25 (footnote omitted); *accord Matteo,* 171 F.3d at 886. Moreover, in determining whether a Supreme Court rule "fairly ... require[s] a particular result in a particular case," the First and Third Circuits have stressed that the "AEDPA's legislative history, especially the dialogue during floor debates, indicates beyond peradventure that Congress did not intend to strip federal courts of their authority independently to assess the merits of federal questions raised in habeas petitions." *O'Brien,* 145 F.3d at 22; *accord Matteo,* 171 F.3d at 890.

Because each of the mixed questions of law and fact presented in this case—suggestiveness of the identification procedures, suppression of *Brady* material, and ineffective assistance of counsel—involve the application of general "framework" rules that have been clearly established by the Supreme Court, in this case there is no meaningful difference between (1) examining the record to determine whether the state courts "unreasonabl[y] appli[ed]" those general rules to the facts of this case (the Fifth/Seventh/Eleventh Circuit approach), and (2) independently examining the record to determine whether those rules "can be fairly said to require" a contrary result in this particular case (the First/Third Circuit approach).

*Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)); *accord Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977).

In light of the Appellate Division's opinion and the evidence on the record, the state court's decision was not contrary to, nor did it involve an unreasonable application of, federal law as determined in the *Neil* decision. The Appellate Division treated petitioner's claim at length, offering the following explanation for its ultimate rejection of the claim:

> The hearing court properly declined to suppress the proposed identification testimony of the eyewitnesses.
>
> Contrary to the defendant's claim, the photographic array was not suggestive and did not draw the viewer's attention to the defendant's photograph. Even if the other men depicted in the photographic array were of Hispanic origin, they were similar in appearance to the defendant, who is Albanian, insofar as each had dark hair and eyes, a mustache, some facial hair on their chins, and a prominent nose. Further, all but one of the men in the photographic array had a dark skin tone similar to the defendant's skin tone. As conceded by the defendant, there is no requirement that a defendant be surrounded by individuals nearly identical in appearance during identification procedures.

*Leka*, 209 A.D.2d at 724, 619 N.Y.S.2d at 145–46 (citations omitted).

■ Examination of the photo array that included petitioner's photograph, as well as the relevant case law, reveals that the Appellate Division's decision was entirely reasonable. While there is no evidence in the record regarding the actual ethnicities of the fill-ins, at least one of the fill-ins, viz., number three, could clearly pass for an Eastern European, and another of the fill-ins, viz., number one, looks as though he could be of European descent. In any case, whatever the racial or ethnic backgrounds of the other subjects in the photo array, they are indeed not so dissimilar from petitioner so as to impermissibly suggest that he was the perpetrator.[22] Moreover, other courts applying the *Neil* standard have agreed that due process does not require line up or photo array fill-ins to share the defendant's exact characteristics, ethnic or otherwise.[23]

Finally, although the Appellate Division did not allude to the point in its opinion, to

---

**22.** Notably, the photo arrays were entered into evidence at trial, and petitioner's trial counsel directly argued the suggestiveness of the Leka photo array to the jury in his opening argument and in his summation. *See* T. 130–31, 1743, 1763–64; *see also* T. 143–44 (counsel for Zeni Cira) (opening statement) (arguing that *Leka*'s photo array was suggestive).

**23.** *See, e.g., United States v. Reid*, 517 F.2d 953, 966 n. 15 (2d Cir.1975) (Friendly, J.) (concluding that "there is no requirement that even in line-ups the accused must be surrounded by persons nearly identical in appearance, however desirable that may be"); *see also United States v. Fletcher*, 121 F.3d 187, 194 (5th Cir.1997) (photo array was not rendered impermissibly suggestive by fact that defendant's picture was only one in array in which subject was dressed in suit and tie); *United States ex rel. Pella v. Reid*, 527 F.2d 380, 384 (2d Cir.1975) (procedure was not unduly suggestive where relatively short defendant was placed in line up with taller fill-ins); *United States v. Jackson*, 509 F.2d 499, 505 (D.C.Cir.1974) (procedure did not violate due process where defendant was only participant with a "bush" or Afro hair style out of 11 men in line up); *United States v. Castellano*, 610 F.Supp. 1359, 1440 (S.D.N.Y.1985) (line up was not unduly suggestive where defendant was only participant with pock-marked complexion which made him stand out from others); *Wright v. Smith*, 434 F.Supp. 339, 341–42 (W.D.N.Y.1977) (line up was not unduly suggestive where three of five participants were taller than defendant and had distinctly different hair styles), *rev'd on other grounds*, 569 F.2d 1188 (2d Cir.1978); *People v. Ahmed*, 173 A.D.2d 546, 547, 570 N.Y.S.2d 146, 147 (2d Dep't) (despite fact that defendant was Pakistani and all but one of the fill-ins were Hispanic, line up was not unnecessarily suggestive where all members of the line up had same dark hair and dark skin tone), *appeal denied*, 78 N.Y.2d 1073, 577 N.Y.S.2d 236, 583 N.E.2d 948 (1991).

the extent petitioner argues that Torres and Modica picked Leka simply because his photograph was the only picture of an Eastern European man with which they were presented, his claim is severely undercut by the fact that each of the witnesses saw two photo arrays, and each failed to pick anyone out of the first array, which included several persons of Eastern European descent—albeit without mustaches, among them petitioner's Albanian co-defendant, Zeni Cira, who later confessed to the murder. *See* T. 506–508 (Modica); W. 72–76 (Torres).

Petitioner attempts to shore up his tainted identification claim with respect to Torres through additional allegations—which, as discussed below, were expressly rejected by the state trial court[24]—that the police pressured him to choose Leka. Modica, however, even in her "recanting" post-trial affidavit makes no such allegations that police misconduct influenced her choice of petitioner.[25] Thus, distilled to its essence, petitioner's claim with respect to Modica's identification is that she picked Leka solely because his photograph was the only one that she saw of a non-Hispanic with a mustache. At trial, however, Modica disagreed when petitioner's trial counsel suggested that all of the other men pictured in the Leka photo array were Hispanic. In response to questioning intended to elicit such testimony, Modica stated only that she believed the three fill-ins on the bottom row of the photo array "look[ed] Spanish." T. 517. Furthermore, when asked whether numbers one and three also looked "Spanish," Modica testified: "I can't guess by looking at them." T. 518. Notably, trial counsel also asked Torres whether he and Modica had discussed "the fact that you saw a photographic array that had five Hispanics and one Caucasian-looking person," and Torres answered, "No." T. 725–26. Thus, considering the record as a whole, there does not appear to be any evidence that would support petitioner's theory that the photo array was inherently suggestive.

Because the Appellate Division reasonably found the photo array was not impermissibly suggestive, there was no need for it to proceed to the second stage of the *Neil* inquiry, viz., whether the in-court identifications were independently reliable. The state appeals court decision rejecting petitioner's claim, therefore, was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law. Accordingly, no writ can be granted with respect to Leka's claim that the composition of the photo array was inherently suggestive.

### b. Post–Trial Recantations

Petitioner bases a second attack on the photo array and subsequent identifications on Torres' 1991 affidavit, as well as a new, more elaborate affidavit prepared for this petition, Elfren Torres Aff. of 4/10/98, Pet.'s Supp. Mem., Ex. 3 [hereinafter Torres 1998 Aff.], in which Torres alleges—in direct contradiction of his *Wade* hearing and trial testimony—that the police coerced him to pick Leka from the photo array.

### i. Exhaustion

On behalf of respondent, Kings County District Attorney Charles J. Hynes (the "District Attorney") argues that petitioner has failed to exhaust available state court remedies for this aspect of his suggestive identification claim. As the District Attorney observes, examination of petitioner's brief to the Appellate Division reveals that his arguments regarding the photo array identification focused exclusively on the composition of the photo array; petitioner made absolutely no argument regarding police coercion. Moreover, although petitioner did submit Torres' 1991 affidavit to both the trial court and the Appellate Division, he

---

**24.** *See* Section 440.10 Opinion, *supra,* at 9. *See generally infra* § (1)(b)(iv).

**25.** *See* Modica Aff. *passim. See generally infra* § (1)(b)(iv).

did so only in connection with his argument for a new trial in light of newly discovered evidence. Specifically, petitioner presented the 1991 affidavit as newly discovered evidence supporting his theory that Rahman Ferati was the individual Torres had seen outside the car, not Leka. Finally, Torres' 1998 affidavit, which was prepared in conjunction with this petition, has never been presented to the state courts for any purpose.

Nonetheless, under the standard delineated in *Daye v. Attorney General of the State of New York*, 696 F.2d 186 (2d Cir. 1982) (en banc), petitioner's presentment claim, tenuous though it may be, has merit. In *Daye*, the Second Circuit held that to satisfy the exhaustion requirement a petitioner must have informed the state court of both the factual premises of his claim and "essentially the same legal doctrine he asserts in his federal petition." *Id.* at 191–92 (citations omitted). The court clarified that "[b]y the same legal 'basis' or 'doctrine,' we do not mean that there can be no substantial difference in the legal theory advanced to explain an alleged deviation from constitutional precepts." *Id.* at 192 n. 4. As an example, the court stated that the exhaustion requirement would be met in a case where a state defendant made an involuntary confession claim in the state courts based on physical coercion, but argued in federal court that coercion was shown by the totality of the circumstances including psychological coercion. *See id.* (citing *United States ex rel. Kemp v. Pate*, 359 F.2d 749 (7th Cir.1966)). In addition,

the Second Circuit held that a state defendant may fairly present a constitutional claim to the state courts for exhaustion purposes by "allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* at 194.

In this case, petitioner argued a tainted identification claim (albeit one based on the composition of the photo array) in his brief to the Appellate Division. *See* Pet.'s App. Mem. at 37–42. In addition, by submitting copies of Torres' 1991 affidavit to the trial court and the Appellate Division, petitioner presented a pattern of facts— Torres' being pressured to pick Leka and subsequently persuaded that Leka was the shooter—to the state courts,[26] which, if true, would clearly provide an alternative ground for such a claim. Under *Daye*, petitioner's police coercion theory of tainted identification was, therefore, fairly presented to the state courts notwithstanding the fact that petitioner's brief to the Appellate Division did not invoke Torres' allegations of police misconduct in the context of petitioner's tainted identification claim.[27]

### ii. Independent and Adequate State Grounds

The Appellate Division's opinion on the tainted identification issue specifically addresses only the question whether the composition of the photo array was inherently suggestive. Petitioner's "remaining contentions"—including, presumably, the police coercion aspect of his tainted identi-

---

26. *See* Pet.'s App. Mem. at 49 (" '[The shooting] happened so quickly that I was pressured to pick out Mr. Leka by the Police and then led to believe that it was Mr. Leka through conversations with various detectives.' " (quoting Torres 1991 Aff. ¶ 5)).

27. Had petitioner not fairly presented his claim of coercive police tactics to the state courts, the ultimate disposition of the claim would have been the same. Because the state courts did determine the primary, historical fact necessary to decide the claim that police misconduct tainted the identification—viz., the incredibility of Torres' recantation—this

case would have presented an appropriate occasion for the exercise of the court's discretion under the AEDPA to deny petitioner's claim on the merits notwithstanding his failure to exhaust state remedies. *See* 28 U.S.C. § 2254(b)(2) (Supp.1999). *See generally Granberry v. Greer*, 481 U.S. 129, 134–35, 107 S.Ct. 1671, 1675–76, 95 L.Ed.2d 119 (1987) (pre-AEDPA) (explaining that principles of comity and judicial economy make dismissal for lack of complete exhaustion appropriate if a case presents an issue on which an unresolved question of fact or state law might have an important bearing).

fication claim—were dismissed as being "either unpreserved for appellate review or without merit." *See Leka,* 209 A.D.2d at 725, 619 N.Y.S.2d at 146. The facial ambiguity of the Appellate Division's leaves uncertain the whether the particular claim now under discussion—the police coercion claim—was "adjudicated on the merits," 28 U.S.C. § 2254(d) (Supp.1999), or was dismissed on the ground of a state procedural default and hence not subject to federal habeas review, *see Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991) (holding that federal habeas review is generally barred where a state prisoner defaults his federal claims pursuant to an "independent and adequate" state procedural rule). Moreover, because the police coercion claim was not presented to the state trial court, there is no lower court ruling to which this court may look to illuminate the basis for the Appellate Division's decision. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801–03, 111 S.Ct. 2590, 2593–95, 115 L.Ed.2d 706 (1991) (holding that when a lower state court spoke clearly, all unexplained affirmances of that opinion by higher state tribunals must ordinarily be read to confirm the unambiguous holding of the lower court).

■ In similar circumstances, one recent Second Circuit panel has held that habeas review of a petitioner's claims was not procedurally barred where the New York Court of Appeals summarily rejected those claims as "meritless or unpreserved." *See Tankleff v. Senkowski,* 135 F.3d 235, 247 (2d Cir.1998) (citing *Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557). However, a different Second Circuit panel presented with a case in nearly the same procedural posture later declared: "Whether this language [viz., that defendant's remaining claims are "unpreserved or without merit"] in a state court's affirmance is too ambiguous to preclude federal court review on the independent ground of procedural default has yet to be determined in this circuit." *Hayes v. Coombe,* 142 F.3d 517, 519 (2d Cir.1998) (per curiam), *cert. denied sub nom. Hayes v. Goord,* —— U.S. ——, 119 S.Ct. 879, 142 L.Ed.2d 779 (1999). Although it questioned the basis of the *Tankleff* court's decision on this issue, *see id.* at 519 n. 2, the *Hayes* panel ultimately decided the case before it on other grounds, *see id.* at 519 (holding that petitioner's claims were "patently devoid of merit" and invoking the doctrine of hypothetical jurisdiction).

In absence of clear precedent to the contrary, I will give petitioner the benefit of the doubt on the issue and follow the earlier panel's holding in *Tankleff.* Accordingly, I decline to hold that the Appellate Division's summary dismissal of Leka's remaining claims as "either unpreserved for appellate review or without merit" announces an independent and adequate state ground barring habeas review of his police coercion claim. *Accord Avincola v. Stinson,* 60 F.Supp.2d 133, 153 n. 7 (S.D.N.Y.1999) (following *Tankleff*); *Santana v. Filion,* 55 F.Supp.2d 136, 140 (E.D.N.Y.1999) (same); *McLean v. McGinnis,* 29 F.Supp.2d 83, 92 & n. 7 (E.D.N.Y.1998) (same).

### iii. Standard of Review

Because review of petitioner's police coercion theory of tainted identification is not procedurally barred, the next issue that must be resolved is which standard of review should be applied to the Appellate Division's summary rejection of the claim. Generally, under the AEDPA a state court decision on a mixed question of law and fact, such as that presented by petitioner's police coercion claim, is reviewed under § 2254(d)(1) to determine whether the decision "was contrary to, or involved an unreasonable application" of federal law. *See supra* § (1)(a). By its terms, however, § 2254(d)(1) only applies to claims that were "adjudicated on the merits." This case raises the question whether a state court's summary rejection of a defendant's claim constitutes an "adjudicat[ion] on the

merits" sufficient to qualify for review under § 2254(d)(1)'s deferential standard.

Some courts and commentators have opined that where a "state court summarily disposes of a claim without setting forth the legal or factual basis for its denial," § 2254(d)(1) does not apply, and the federal habeas court should, in accordance with pre-AEDPA law, review the claim de novo. *United States ex rel. Maxwell v. Gilmore,* 37 F.Supp.2d 1078, 1089 (N.D.Ill.1999); *see* 2 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure,* § 30.2b, at 1238 (3d ed.1998) (arguing that summary denial of relief should not suffice for § 2254(d)(1) to apply). These authorities have reasoned that § 2254(d) does not cover summary dispositions because in such cases "there is no state court analysis to examine for 'unreasonableness.'" *Gilmore,* 37 F.Supp.2d at 1088; *see* 2 Liebman & Hertz, *supra,* § 30.2b, at 1238 (same).

Other courts have held that a summary disposition of a petitioner's claim is an "adjudicat[ion] on the merits" within the meaning of § 2254(d)(1), but that in such cases, "the practical significance of (d)(1)'s deferential standard of review is lessened." *Cardwell v. Netherland,* 971 F.Supp. 997, 1015 (E.D.Va.1997). "'Where ... there is no indication of how the state court applied federal law to the facts of a case,'" a federal habeas court must necessarily undertake its own independent review of the record, with the result that "'the distinction between de novo review and "reasonableness" review becomes less significant.'" *Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.) (quoting *Netherland,* 971 F.Supp. at 1015), *cert. denied,* —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998); *see also Delgado v. Lewis,* 181 F.3d 1087, 1091 (9th Cir.1999) ("[W]hen confronted with a state court decision that does not provide the basis of its decision, [a federal habeas court] must determine whether, in light of an independent review of the record and the relevant federal law, the state court's resolution of a petitioner's

claim was 'contrary to, or involved an unreasonable application of, clearly established Federal law ....,'" because "when a state court does not articulate the rationale for its determination, a review of that court's 'application' of clearly established federal law is not possible."); *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir.1998) (declining to "presume that a summary order is indicative of a cursory or haphazard review of a petitioner's claims," but requiring "independent review of applicable law" by federal habeas court).

Still other courts have held the summary nature of a state court opinion does not affect the applicable standard of review under § 2254(d)(1). *See James v. Bowersox,* 187 F.3d 866, 869 (8th Cir.1999); *see also Hennon,* 109 F.3d at 335 (holding that "perfunctory" state court rulings are nonetheless evaluated pursuant to § 2254(d) for reasonableness); *cf. McLee v. Angelone,* 967 F.Supp. 152, 156 (E.D.Va. 1997) ("There is no requirement in the statute that the state court decision be detailed or explanatory in nature for § 2254(d) to apply."). In adopting such an interpretation, Chief Judge Posner of the Seventh Circuit reasoned that a contrary approach that focused on the "quality of the reasoning process articulated by the state court in arriving at the determination" "would place the federal court in just the kind of tutelary relation to the state courts that the recent amendments are designed to end." *Hennon,* 109 F.3d at 335. Chief Judge Posner, however, candidly admitted:

> [O]f course the better the job the state does in explaining the grounds for its rulings, the more likely those rulings are to withstand further judicial review.
>
> That is just realism. It doesn't follow that the criterion of a reasonable determination is whether it is well-reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case.

*Id.*

In dicta, I recently agreed with Chief Judge Posner's approach to § 2254(d)(1).

*See Sellan v. Kuhlman,* 63 F.Supp.2d 262, 267–68 (E.D.N.Y.1999) (discussing *Hennon,* 109 F.3d at 334–35). However, as in *Sellan,* the facts of this case do not require a decision on the issue. Petitioner's claim fails even on the least deferential standard of review. Accordingly, in the interest of judicial prudence, petitioner's police coercion theory of tainted identification will be reviewed de novo. *See Gilmore,* 37 F.Supp.2d at 1089.

■ When reviewing a mixed question of law and fact de novo, a federal habeas court is still bound to defer to relevant state court findings of fact under the standard of review prescribed by § 2254 for factual determinations. *See* 28 U.S.C. § 2254(d)(2)(e)(1) (Supp.1999); *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985) (in context of de novo habeas review of the voluntariness of a confession, subsidiary factual questions such as "whether in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254(d) presumption [of correctness]" (citation omitted)); 1 Liebman & Hertz, *supra,* § 2.4b, at 27 (if analysis of mixed question of law and fact turns on a historical fact, habeas court must defer to state courts' findings with regard to that fact unless, inter alia, the finding is "unreasonable" under the AEDPA standard). Thus, in deciding whether the misconduct alleged in the 1991 affidavit constitutes an impermissibly suggestive identification procedure, this court must accept the state trial court's written assessment of the affidavit's credibility as long as that factual determination meets the requirements of § 2254(d). *See Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 756 n. 6, 9 L.Ed.2d 770 (1963) (on habeas review, " 'issues of fact' " means "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators' " (citation omitted)). Because the AEDPA changed the standard of review that § 2254(d) prescribes for state court factual determinations, some discussion of the new standard and its predecessor is warranted.

Prior to the enactment of the AEDPA, § 2254(d) directed federal habeas courts to accord a presumption of correctness to state court factual determinations that were evidenced by written findings made after an adversarial hearing on the merits unless, among other enumerated exceptions, the state court factual determination was not "fairly supported by the record [in the state court proceeding]." 28 U.S.C. § 2254(d) (1994) (superseded).[28] If none of

---

**28.** The prior statute read, in relevant part:

[A] determination after a hearing on the merits of a factual issue, made by a State court ..., evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceedings;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

the exceptions applied, a writ could still be granted if the petitioner could establish by "convincing evidence"—including evidence outside the state court record—that the factual determination was erroneous. *See id. See generally* 1 Liebman & Hertz, *supra,* § 20.2c (describing pre-AEDPA standard of review).

The AEDPA substantially modified the applicable standard of review for state court factual determinations by eliminating the various exceptions enumerated in old subsection (d) and replacing them with a single inquiry into the substantive fairness of the factual determination. Section 2254(d) now provides, in pertinent part:

An application for a writ of habeas on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2) (Supp.1999). Notwithstanding its elimination of the old habeas statute's various exceptions related to procedural fairness,[29] the AEDPA provides in a new subsection that state court factual determinations are still entitled to a presumption of correctness and that an applicant must now rebut that presumption by

"clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (Supp.1999).[30]

Neither the Supreme Court nor the Second Circuit has yet provided guidance on the interplay between the reasonableness inquiry prescribed by § 2254(d)(2) and the clear and convincing evidence standard of § 2254(e)(1). Some commentators have suggested that the two subsections should be read together in light of the former statute as prescribing a two-step inquiry: first, into the reasonableness of the state court's determination on the record before the state court, and second, into whether the petitioner can establish by clear and convincing evidence (whether in the state record or not) that the factual determination is erroneous. *See* 1 Liebman & Hertz, *supra,* § 20.2c, at 751–52. On this reading, a federal habeas court could grant a writ based on a challenge to a state court factual determination that was reasonable in light of the evidence presented to the state court if a petitioner can establish factual error by clear and convincing evidence (including newly discovered evidence). *See id.; see also Valentine v. Senkowski,* 966 F.Supp. 239, 241 (S.D.N.Y. 1997) (after holding that state court determination was not unreasonable in light of evidence presented to state court, district court only dismissed petition upon additional holding that petitioner had not satisfied the burden of rebutting by clear and convincing evidence the presumption of the

And in an evidentiary hearing in the proceeding in Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.
28 U.S.C. § 2254(d) (1994) (superseded).

29. Some courts and commentators have suggested that the various exceptions to the presumption of correctness under the former § 2254(d)—primarily requirements of procedural fairness—survive the AEDPA and are implied by the new § 2254(d)'s proviso that deferential habeas review only applies to state court "adjudications." *See* 2 Liebman & Hertz, *supra,* § 30.2b, at 1236–38 & nn. 14–20 and cases cited therein.

30. It is unclear whether the change in language from "convincing" to "clear and convincing" indicates a substantive change in the quantum of proof necessary to overcome the presumption of correctness. *See* 2 Liebman & Hertz, *supra,* § 31.3 (suggesting that the change is not substantial).

correctness accorded to that decision). By contrast, some courts, most notably the Fifth Circuit, have read subsections (d)(2) and (e)(1) to impose the more onerous requirement that petitioner *both* show that the state court determination was unreasonable in light of the state court record *and* demonstrate by clear and convincing evidence (including newly discovered evidence) that the determination was in fact erroneous. *See, e.g., Jackson v. Anderson,* 112 F.3d 823, 824–25 (5th Cir.1997). *But see* Larry W. Yackle, *Developments in Habeas Corpus (Part 2),* Champion, Nov. 1997, at 16, 17 (arguing that such an interpretation inappropriately bars habeas relief where the content of the state court record was limited as a result of state court procedures that violated due process). *See generally* Note, *Rewriting the Great Writ: Standards of Review for Habeas Corpus under the New 28 U.S.C. § 2254,* 110 Harv. L.Rev. 1868, 1873–76 (1997) (surveying attempts to reconcile subsections (d)(2) and (e)(1)).

Disposition of the present claim does not require a decision on the interplay of § 2254(d)(2) and § 2254(e)(1). Even if the more liberal, two-step inquiry suggested by Professors Liebman and Hertz is followed in this case, petitioner's police coercion claim must be rejected. Therefore, without resolving the issue and solely for the purpose of disposition of this case, the two-step inquiry will be applied to petitioner's claim.

### iv. Reasonableness of the State Courts' Factfinding

█ In its opinion denying petitioner's motion to set aside the conviction on the basis of newly discovered evidence, the trial court expressly found Torres' 1991 affidavit to be "incredible recanting testimony." Section 440.10 Opinion, *supra,* at 9. In the pertinent paragraph of the affidavit, Torres states: "I was pressured to pick out Mr. Leka by the Police and then led to believe that it was Mr. Leka through conversations with various detectives."

Torres 1991 Aff. ¶ 5. However, as the trial court observed:

> This allegation is conclusory. Mr. Torres does not state any specific action taken by police to coerce him into identifying Mr. Leka. The conclusion that he was pressured also fails to explain why he was unable to recant his identification earlier.
>
> \* \* \* \* \* \*
>
> Additionally, the court finds the allegation incredible as defense attorney was present at both lineups in which Mr. Torres identified Sami Leka as the shooter. The allegation directly contradicts Mr. Torres' trial testimony, and is recanting testimony.

Section 440.10 Opinion, *supra,* at 9 (citation omitted).

Indeed, both at the *Wade* hearing and at trial, Torres testified unequivocally that the police who drove him and Modica to the precinct on the night after the shooting did not relate any information about the case to them, *see* W. 96; that the police did not present the photo arrays to him in a suggestive manner, *see* W. 72–73; T. 707–08; that no one told him who to choose, *see* W. 76; T. 708; that no one directed his attention to any particular photo, *see* W. 76; T. 708; that the police did not tell him that he and Modica had picked the same person, *see* T. 708–709; and that the police did not tell him he had chosen the right suspect, *see* W. 75, 102–03. In light of this evidence, the trial court's finding that the allegations of police coercion and persuasion recited in Torres' 1991 affidavit were unworthy of credence is not an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As noted previously, on this habeas petition Leka's police coercion argument focuses on a new, greatly elaborated affidavit which was given by Torres some seven years after his first affidavit and which has never been presented to the state courts. Assuming for the sake of argument that a

federal habeas court may consider this new evidence under § 2254(e)(1), the 1998 affidavit, when taken in conjunction with the evidence before the state courts, does not constitute clear and convincing evidence sufficient to rebut the presumption of correctness accorded to the state trial court's factual determination that Torres' allegations of police misconduct are false.

As an initial matter, both federal and New York state courts view the recantation of testimony given at trial with "utmost suspicion" due to its inherent unreliability. *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (2d Cir.1975); *see People v. Donald*, 107 A.D.2d 818, 819, 484 N.Y.S.2d 651, 652 (2d Dep't 1985) ("It is ancient learning that '[t]here is no form of proof so unreliable as recanting testimony.'" (quoting *People v. Shilitano*, 218 N.Y. 161, 170, 112 N.E. 733, 736 (1916))). Upon considering the record as a whole, this court can find no facts that would redeem Torres' most recent recantation.

In his 1998 affidavit, Torres expands on and amplifies his recantation, now claiming that he knew from conversations with his wife and the police that Albanians were involved in the shooting. *See* Torres 1998 Aff. ¶ 4. In particular, Torres alleges that the police discussed this with him and Modica while they were driving together to the precinct. *See id.* Torres states that he focused on the only non-Hispanic in the photo array shown to him at the precinct and that once he told the police that he thought the non-Hispanic was the shooter, the police began to pressure and reassure him in an effort to make him more definite about his identification. *See id.* ¶¶ 6–8. Torres explains that he succumbed to these police tactics because it was the middle of the night, and he was concerned about Modica's health. *See id.* ¶ 8.[31] In addition, Torres now claims that the police informed him and Modica that they had both picked the same person.

*See id.* ¶ 9. As noted above, each of these statements is directly contradicted by Torres' *Wade* hearing testimony, in which he denied that the police had related any facts regarding the case to him, had suggested which individual he should pick from the photo array, or had advised him that he had picked the right person. *See* W. 72–73, 75–76, 102–03.

Torres also asserts that when he and Modica discussed the events at the precinct, they discovered that they had similar experiences while being shown the photo array. *See* Torres 1998 Aff. ¶ 9. For her part, Modica makes no such allegation of police "pressure" in her 1991 affidavit,[32] *see* Modica Aff. *passim*, which is consistent with the testimony she gave both at trial and the *Wade* hearing that the police did not present the photo array to her in a suggestive or coercive manner, *see* T. 523–24; W. 23–26.

Torres goes on to explain that he continued to identify petitioner as the shooter because he recognized petitioner from the photo array and he believed that he was doing the right thing. *See* Torres 1998 Aff. ¶¶ 10–12, 13. However, when Torres identified Leka from the line up conducted at the *Wade* hearing, Torres testified that the reason he was identifying Leka was because he recognized Leka from the incident, not because he remembered Leka from the photo array or the earlier precinct house line up. *See* W. 86.

Finally, Torres claims that upon seeing a picture of Ferati after the trial, he recognized Ferati as the man he had seen firing a gun on the evening of February 12, 1988. *See* Torres 1998 Aff. ¶ 13. This statement conflicts with Torres' 1991 affidavit in which he stated that "the shooting only came from the car." Torres 1991 Aff. ¶ 6. Moreover, in view of the fact that Torres told the police,[33] and later testified at trial,

---

**31.** At trial, Torres testified that Modica had "some sort of cold" that night. T. 709–10.

**32.** Unlike her husband, Modica did not give a new affidavit in conjunction with this petition.

**33.** *See* Complaint–Follow Up Informational of

that he saw the victim, whom he later learned to be Ferati, lying mortally wounded on the street and had looked the victim in the face,[34] Torres' explanation for his recantation is simply incredible. Before Torres ever saw Ferati's picture, he should have been able to distinguish Leka from Ferati.

For the foregoing reasons, the allegations in Torres' 1998 affidavit concerning police misconduct do not provide clear and convincing evidence rebutting the presumption of correctness accorded to the state trial court's reasonable determination that Torres' allegations of coercive or improper police tactics are false. Accordingly, this court is bound by that factual determination in deciding whether the pretrial identification procedures were unduly suggestive. Because the record does not otherwise contain any evidence of police misconduct in relation to Torres and Modica's photo array identifications of the petitioner, petitioner has not shown that the identification procedure was impermissibly suggestive in violation of the first prong of the *Neil* test. Consequently, there is no need to proceed to *Neil*'s independent reliability prong. The police conduct surrounding the photo array did not violate due process, and petitioner's application for a writ cannot be granted on this ground.

### (2)

Petitioner's second claim in support of his petition is that the prosecution suppressed material evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, petitioner claims that the prosecution withheld: (1) a police interview report of Anthony Chiusano, a bus driver who drove past the scene of the shooting as it occurred; (2) grand jury testimony of Joseph Gonzalez, a postal worker who lived in an apartment across the street from the shootout; and (3) the identity of Officer Wilfredo Garcia as an impeachment witness. Garcia was an off-duty police officer who witnessed part of the shooting and administered first aid to Ferati before the ambulance arrived.

#### a. Petitioner's Arguments

##### i. Suppression

Petitioner alleges that the prosecution suppressed the grand jury testimony of Gonzalez and the police report of Chiusano's interview by withholding these two pieces of evidence until two days and "days" prior to trial, respectively, despite a defense request for "Brady Material" two years earlier. *See* Letter from Benfante to Assistant District Attorney Malaby of 4/26/88, at 7–8, Pet.'s Supp. Mem., Ex. 9. Petitioner claims that the incorrect spelling of Chiusano's name as "Cansano" and the fact that Gonzalez had moved to Florida further precluded petitioner from using this evidence at trial. *See* Pet.'s Supp. Mem. at 12, 14.

In the case of Garcia, petitioner's allegations go beyond untimely disclosure. Petitioner accuses the prosecution of actively obstructing his efforts to contact Garcia through misrepresentations to defense counsel and the trial court. Petitioner claims that at some point before trial the prosecutor told his trial counsel that Garcia could identify Leka as the gunman. Later, when the defense attempted to contact Garcia during jury selection, the pros-

Elfren Torres dated 2/13/88, Pet.'s Supp. Mem., Ex. 1 [hereinafter Torres DD–5] ("We went back to the scene and we saw a man lying on his back with his head towards the curb.").

**34.** At trial, Torres testified as follows:
Q [After the shooting] [d]id you go toward the man?
A Yes.

Q How close did you get to him?
A It was right, right in front of him, right over him.

 * * * * * *

Q Were you able to see his face at this time?
A Yes.
T. 596–97.

ecutor represented to the trial court that Garcia would be called as a prosecution witness and that he did not wish to speak to the defense. Relying on these representations, the trial judge forbade the defense from attempting to speak to Garcia before he was called. The prosecution, however, never called Garcia and thus— according to petitioner—effectively concealed the content of Garcia's potential impeachment testimony from the defense.

### ii. Materiality—Chiusano

During an interview with police on February 18, 1988, Chiusano stated that he was driving his bus south on Ocean Avenue at the time of the incident. *See* Chiusano DD–5, *supra.* Chiusano stopped for a red-light at Avenue N.[35] *See id.* A light-colored car pulled alongside his bus and also stopped for the red-light.[36] *See id.* When the light changed to green, "the car pulled away faster than he could and he paid no attention to the auto." *Id.* Chiusano then heard what sounded like a car backfiring and noticed that the light-colored car was double-parked on Ocean Avenue and that a white hand was sticking out the back window and firing a gun. *See id.* Chiusano told the passengers to duck, and he veered into the opposite lane to get away from the shooting. *See id.* When he finally came to a stop, the bus was near a gas station at the end of the block on the left hand side of the street. *See id.* Chiusano stated that he believed there were three or four people in the car, but he could not identify anyone "because he was to [sic] busy driving the bus to get a look at anyone inside the auto." *Id.*

Petitioner argues that the sequence of events Chiusano described is inconsistent with Modica's testimony that the light-colored car had been double-parked on Ocean Avenue before the shooting began. *See* Pet.'s Supp. Mem. at 24. In the alternative, petitioner argues that Chiusano's testimony might actually exculpate the petitioner rather than merely impeach Modica. *See id.* Notably, during summation, petitioner's trial counsel argued a "two-car" theory to the jury, in which he credited Modica's testimony that she had seen a car containing someone resembling Leka sitting double-parked on Ocean Avenue, but suggested that *that* light-colored car had pulled away after Modica passed by and that a second light-colored car containing the gunman pulled up just after it. *See id.* Petitioner's habeas counsel argues that if the jury had been presented with and had credited both Chiusano and Modica's testimony, the jury would have concluded that Leka was not in the gunman's car and, therefore, could not have been the gunman. *See id.*

### iii. Materiality—Garcia

In an affidavit prepared for petitioner's § 440.10 motion, Garcia stated that he lived on the block of Ocean Avenue where the shooting took place. *See* Garcia Aff. ¶ 1. On the evening of the shooting, Garcia was doing his dishes when he heard what sounded like gunfire in the street. *See id.* ¶ 4. Garcia looked out his window and saw a white car "stop" in front of a white male standing on the opposite side of the street. *Id.* Garcia also saw muzzle flashes coming

**35.** Chiusano actually stated that he stopped at Avenue O, and that the shooting took place between Avenues O and P. In light of the other evidence in this case, Chiusano appears to have misspoke on this point. The recitation of his account given above has therefore been conformed to the other proof on record.

**36.** There is a slight discrepancy on this point between the account Chiusano gave to police during the week after the shooting and the account he gave in an affidavit prepared for Leka's § 440.10 motion three years later. In

the 1991 affidavit, Chiusano states that he pulled up "directly behind" rather than alongside the light-colored car at the intersection. *Compare* Anthony Chiusano Aff. ¶ 4, Pet.'s Mem., Ex. 5, *with* Chiusano DD5, *supra.* Although the nearly contemporaneous account given in the police report is presumably more accurate on such details, the difference does not appear to be material. At any rate, petitioner has adopted the police report version in his supplemental memorandum. *See* Pet.'s Supp. Mem. at 13.

from the passenger side of the car. *See id.* Concerned that a friend for whom he was waiting might be involved in the shooting, Garcia ran to his bedroom to get his off-duty weapon. *See id.* ¶¶ 4–5. As he was leaving his bedroom, Garcia heard additional shots, looked out his window again, and saw more muzzle flashes coming from the white car. *See id.* ¶ 5. As Garcia rushed downstairs he heard additional shots, but when he reached the street, the shooting had stopped and the white car was gone. *See id.* ¶ 6.

Petitioner argues that Garcia's testimony would provide additional support for the theory that the gunman never stepped out of the car, thus impeaching Torres' account of the incident. *See* Pet.'s Supp. Mem. at 16–17. Petitioner also argues that Garcia's testimony, like Chiusano's, either would have refuted Modica's account of the car as having been double-parked for any length of time before the shooting began, or, alternatively would have supported trial counsel's two-car theory. *See id.* at 17.

### iv. Materiality—Gonzalez

Before the grand jury, Gonzalez testified that he was in his living room on the evening of the murder when he heard five shots fired. *See* Gonzalez Grand Jury, *supra*, at 5.

> [Gonzalez] ran to the window to see what it was and noticed a man across the street with a gun in his hand firing at a white car, and at that time there was a bus, a Command Bus driving around the car trying to avoid the car and before the bus got clear of the car the car took off with the bus, and the man fell back.

*Id.* Gonzalez added that the victim was still firing as he fell back, but that he (Gonzalez) could not see the people in the white

car, because the bus obscured his view. *See id.* at 6, 8–9.

Petitioner argues that Gonzalez's testimony, like Chiusano and Garcia's, demonstrates that, contrary to Torres' account, there was never a time that anyone got out of the light-colored car. *See* Pet.'s Supp. Mem. at 23.

### b. Respondent's Arguments

In opposition to these claims, the District Attorney interposes four arguments. First, the District Attorney claims that petitioner is barred from asserting any *Brady* claim because he failed to raise it on his direct appeal and has consequently not exhausted it. *See* Resp.'s Supp. Mem. at 5–6. Second, the District Attorney claims that the prosecution did not suppress either Gonzalez's grand jury testimony or the police report of Chiusano's interview, since it turned over both items prior to trial. *See* Resp.'s Mem. at 28–29. Third, the District Attorney asserts that petitioner had knowledge of Garcia's account before trial. *See* Resp.'s Supp. Mem. 6. Finally, the District Attorney claims that the evidence does not rise to the level of materiality necessary under *Brady,* even if the court were to find that it was suppressed. *See* Resp.'s Mem. at 29.

### c. Standard of Review

Because petitioner did in fact present a *Brady* claim, however inartfully, on his direct appeal, *see* Pet.'s App. Mem. at 55, 77 (arguing that the Chiusano, Garcia, and Gonzalez evidence was not just newly discovered evidence but also *Brady* material), petitioner has exhausted the remedies available in the state courts with respect to his *Brady* claim.[37] However, neither the trial court nor the Appellate Division expressly considered petitioner's *Brady* claim. Instead, the state courts disposed

---

**37.** Petitioner's counsel also raised the claim during oral argument on pre-trial motions and at the oral argument on the post-trial § 440.10 motion; on both occasions, counsel

expressly invoked *Brady. See* T. 13–14, 16, 23 (pre-trial argument); Transcript of Oral Argument held on June 14, 1991, at 6, 12, 23, Pet.'s Mem., Ex. 31 (post-trial argument).

of petitioner's arguments concerning Chiusano, Gonzalez, and Garcia on the ground that the grand jury testimony and the police report, as well as the three witnesses' affidavits, did not qualify as newly discovered evidence under N.Y. C.P.L. § 440.10. *See* Section 440.10 Opinion, *supra*, at 5–6, *aff'd*, 209 A.D.2d 723, 725, 619 N.Y.S.2d 144, 146 (2d Dep't 1994). The only state court adjudication of petitioner's *Brady* claim is the Appellate Division's summary rejection of his "remaining contentions" as "either unpreserved ... or without merit." For the same reasons discussed in the context of petitioner's police coercion claim, petitioner's *Brady* claim will be reviewed de novo. Relevant factual determinations by the state courts will, however, be entitled to deference under § 2254(d)(2)-(e)(1). *See supra* § (1)(b)(ii)-(iii).

■ In order to establish a *Brady* violation, petitioner must show (1) that the prosecution failed to disclosed favorable evidence, and (2) that the evidence it suppressed was material. *See United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (citing *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). As discussed below, petitioner cannot establish either element.

**d. The alleged *Brady* material was not suppressed.**

■ A defendant has no constitutional right to receive *Brady* or *Giglio* materials before trial. *See United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n. 1 (2d Cir.1974); *United States v. Heatley*, 994 F.Supp. 483, 492 (S.D.N.Y.1998) (Sotomayor, J.). Exculpatory materials need only be disclosed in sufficient time to permit a defendant to make effective use of

them at trial. *See Grant v. Alldredge*, 498 F.2d 376, 382 & 383 n. 7 (2d Cir.1974); *Heatley*, 994 F.Supp. at 492. Moreover, a defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.' " *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982)) (alteration added). If the defendant has information but fails to use due diligence to make use of it, the defendant cannot later claim that the government "suppressed" evidence. *See LeRoy*, 687 F.2d at 618.

■ The question of whether the petitioner, through the exercise of due diligence, could have located and interviewed Chiusano, Garcia and Gonzalez in time to make effective use of their testimony at trial is a factual one. In disposing of petitioner's post-trial motion to vacate the judgment on the ground of newly discovered evidence, the trial court and the Appellate Division were required to, and did in fact, decide this question. *See* N.Y. C.P.L. § 440.10(1)(g) (defining newly discovered evidence as evidence that, inter alia, "could not have been produced by the defendant at the trial even with due diligence on his part"). The trial court held that petitioner had "ma[d]e no showing as to why the evidence contained in [the Chiusano, Garcia, and Gonzalez affidavits] could not have been obtained for use at trial." *See* Section 440.10 Opinion, *supra*, at 5–6. Further, the trial court specifically observed that Chiusano could have been located through rudimentary investigative work and that "Garcia was known [to the defense]." *Id.* at 6 n. 2.[38] The Appellate Division affirmed, holding that the "allega-

---

**38.** In addition, during oral argument on pre-trial motions held on February 26, 1990, and in response to defense counsel's complaint that they did not have enough time to locate Gonzalez, the trial judge stated:

My position will be, gentlemen, the issue of Gonzalez being a possible witness under

*Brady,* as far as I am concerned has been decided. I gave the defendants time, last Friday, and this weekend, and also today. I don't see that there is that much prejudice to their case. They had the time.

T. 16.

tions set forth in the moving papers failed to meet the requirements for newly discovered evidence." *Leka,* 209 A.D.2d at 724, 619 N.Y.S.2d at 146 (citation omitted).

The state courts' determination on this question of fact was reasonable in light of the evidence before them and thus binding on habeas review. *See* 28 U.S.C. § 2254(d)(2) (Supp.1999). The grand jury testimony of Gonzalez and the police report given by Chiusano were disclosed to the defense by February 22, 1990—*eight* days before opening arguments were made on March 2, 1990, and *twenty-two* days before the defense began its case on March 16, 1990.[39] With respect to Anthony Chiusano, petitioner argues this was not enough time to locate him, because his name is misspelled as "Anthony Cansano" in the police report. However, as the state trial court pointed out in its opinion on Leka's § 440.10 motion:

> To the degree that the former attorney [Benfante] alleges that the name of the bus driver (Chiusiano [sic]) could not be obtained because of a wrong name, there is no evidence why the correct name could not be ascertained. An examination of the bus company records would have revealed the correct name.

Section 440.10 Opinion, *supra,* at 6 n. 2. Moreover, a copy of Chiusano's DD-5 submitted by petitioner with his supplemental memorandum of law reveals that the report gave Chiusano's home address, the name of his employer ("Command Bus Service"), his position ("bus driver"), which route he was driving ("BN3"), in which direction (Manhattan–to–Brooklyn), and at what time of the day (the "5 O'Clock run"). *See* Chiusano DD–5, *supra.* Thus, the misspelling of his last name could not have created any difficulty in locating Chiusano.

With respect to Gonzalez, petitioner states that he could not be located in time for the defense to offer him as a witness because he had moved to Florida. However, as of February 26, 1990, four days before opening arguments and eighteen days before the defense began its case, defense counsel already knew the particular town in Florida to which Gonzalez had moved, Atlantic Beach. *See* T. 3. Indeed, Gonzalez was apparently located as of March 6, 1990—ten days before the defense began its case—but defense counsel *chose* not to present Gonzalez at that point:

> THE COURT: Gentlemen, did you reach the witness you were looking for, Gonzalez?
>
> MR. BENFANTE: We know about where he is. I think it is academic at this point.
>
> THE COURT: You are not going to call him?
>
> MR. BENFANTE: No.

T. 280.[40]

Finally, with respect to Garcia, although petitioner asserts that the prosecution

---

**39.** On Monday, February 26, 1990, defense counsel indicated to the trial court that they had received a transcript of Gonzalez's grand jury testimony as part of the prosecution's *Rosario* disclosure on the preceding Thursday. *See* T. 16–22. On the same date, defense counsel also stated that they had received the police reports—the "DD–5" 's—"about a week or so ago." *Id.* As best as this court can tell, petitioner's assertion that the prosecution disclosed this material "just two *days* prior to the trial," Pet.'s Supp. Mem. at 12, seems to be based on the fact that the disclosure came two business days prior to the start of jury selection.

**40.** It is not clear why trial counsel decided not to call Gonzalez. The explanation may well lie in the fact that the victim's brother, Sali Ferati, had testified the day before that, from his window looking out on Ocean Avenue, he saw the light-colored car speeding away just as his brother was falling to the ground. *See* T. 187. Trial counsel may have decided that in view of Sali Ferati's testimony he would no longer need Gonzalez's testimony to impeach Torres' testimony that the gunman stepped out of the car.

Alternatively, it bears noting that, prior to trial, counsel for both Leka and his co-defendant Zeni Cira applied to the court for leave to try the case in the alternative, i.e., to argue both a misidentification theory *and* a self-defense theory to the jury.

thwarted his efforts to discover the substance of Garcia's testimony, the unfolding of events as revealed by the record does not support petitioner's claim. Despite the prosecutor's alleged misrepresentations and obstructive tactics, petitioner's trial counsel had already learned as of the second day of the *Wade* hearing, February 21, 1990—*nine* days before opening arguments and *twenty-three* days before the defense began its case—that Garcia could not identify petitioner as the gunman. *See* W. 197.

The defense did make at least one unsuccessful attempt to interview Garcia between the time of the *Wade* hearing and opening arguments. *See* T. 44. On February 28, 1990, defense counsel represented to the court that Garcia had told a defense investigator that he would like to speak to the defense but that he had to get the prosecutor's permission first. *See* T. 44–45. At that time, the prosecutor stated that he had not told Garcia that Garcia could not speak to defense counsel without his permission, and he represented that he would so advise Garcia. *See* T. 45–46.

Although petitioner's trial counsel thus characterized Garcia as a willing defense witness, *see* T. 44–45, 50, 158; Joseph Benfante Aff. ¶ 21, Pet.'s Supp. Mem., Ex. 7, tellingly, there is no statement in either

Garcia's affidavit or the affidavit of Mary E. Mullin (which recounts an interview Garcia allegedly gave to a television news show in 1998) that indicates Garcia actually wished to speak to Leka's defense counsel or that he was prevented from doing so by the prosecution. *See* Garcia Aff. *passim;* Mullin Aff. *passim,* Pet.'s Supp. Mem., Ex. 6.

At any rate, on the next day, March 1, 1990, the prosecutor stated that he had unsuccessfully attempted to contact Garcia and that he would continue to trying. *See* T. 50–51. Finally, on March 2, 1990, the prosecutor represented to the court that he had succeeded in reaching Garcia and that Garcia had related a very different account of his contact with the defense investigator during the preceding week.

According to the prosecutor, the defense investigator misrepresented himself to the superintendent of Garcia's building as a police lieutenant who needed to contact Garcia on emergency business. *See* T. 156–57. The superintendent relayed this message to Garcia, causing him some degree of concern. *See* T. 157. When Garcia spoke to the "lieutenant" and discovered that he was in fact a private investigator, Garcia refused to speak to him without the prosecutor's permission be-

---

*See* T. 19, 24–25, 37–38, 42–43A. While noting that the defendants were taking a "gambl[e]," T. 34, the trial court granted defendants' application, *see* T. 30–33, and the jury was ultimately given a justification charge, *see* T.1906–07. It was in the support of this justification theory—and not as an impeachment witness—that petitioner's trial counsel originally (and as far as the trial record reveals, ever) contemplated putting Gonzalez on the stand. Specifically, trial counsel argued that Gonzalez's statement that the victim was firing shots at the car supported a self-defense claim. *See* T. 13–14, 19–21, 23–24, 27–28 ("This is a case, Judge, which is made in heaven for a Defense lawyer for justification."). Only *Zeni Cira's* counsel indicated that he was interested in Gonzalez as an impeachment witness. Gonzalez, along with Garcia, administered first aid to Rahman Ferati immediately after the shooting and overheard a conversation in Albanian be-

tween Rahman Ferati, his brother Sali, and his nephew. *See* Gonzalez Grand Jury, *supra,* at 6–8. Zeni Cira's counsel speculated that Gonzalez might be able to impeach Sali Ferati's account of his brother's dying declaration. *See* T. 13. At any rate, by the time that Sali Ferati completed his testimony, petitioner's trial counsel may have reconsidered the wisdom of going forward with a self-defense claim—which would have required him to concede that Leka was in the car—and, for that reason, the whereabouts of Gonzalez had become an "academic" question. Indeed, petitioner's trial counsel appears to have abandoned a justification strategy as of the time of his opening statement. *See* T. 135 (Benfante opening statement) ("Whether you believe that Luftim Cira shot Mr. Ferati in self-defense or not has nothing to do with the fact that *my client was not present at the location* . . . ." (emphasis added)).

cause of the tactics the investigator had used to reach Garcia. *See id.*

In response, petitioner's trial counsel did not deny the use of such tactics in an endeavor to contact Garcia but, nonetheless, steadfastly insisted that Garcia had expressed a desire to speak to the defense investigator.[41] *See* T. 158. Trial counsel, however, fell silent when the prosecutor then offered to bring Garcia to court and allow him to testify as to whether he wished to speak to the defense. *See* T. 157, 159.

It was only at that point that the trial court issued its order prohibiting further defense attempts to contact Garcia. *See* T. 159. Contrary to petitioner's claim, this order did not preclude the defense from further discovering the substance of Garcia's testimony before he was called since the court stated that, before Garcia was called, the defense would be given an opportunity to examine him outside the presence of the jury. *See id.*; *see also* Benfante Aff. ¶ 22, Pet.'s Supp. Mem., Ex. 7 (acknowledgment by trial counsel that this was his understanding of the trial judge's order). Moreover, as the trial court pointed out in its § 440.10 opinion, the trial judge had informed defense counsel that it would entertain a motion to reconsider its order if the prosecution did not call Garcia: "An application after it became clear that Garcia would not testify could have been made. Indeed the court stated that if the prosecutor did not call Garcia, the rulings previously made would be reconsidered." Section 440.10 Opinion, *supra*, at 6 n. 2. When the prosecution rested its direct case without calling Garcia, petitioner's trial counsel apparently did not elect to make such an application.

The trial court's determination that defense counsel could have, through the exercise of due diligence, contacted Chiusano, Garcia, and Gonzalez in time to present

their testimony at trial was therefore reasonable in light of the record before it and is binding on this court under the AEDPA. Accordingly, petitioner has failed to establish the suppression element of his *Brady* claim.

### e. The Chiusano, Garcia, and Gonzalez evidence was not material.

Even if petitioner had established that the Chiusano, Garcia, and Gonzalez evidence was "suppressed," his *Brady* claim would still fail because the evidence in question was not material. "Evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *United States v. Zagari*, 111 F.3d 307, 319–20 (2d Cir.1997) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)(per Blackmun, J.)). "In other words, evidence is material if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Orena*, 145 F.3d 551, 557 (2d Cir.1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)). In applying this standard, the suppressed evidence must be considered collectively, not item by item. *See Kyles*, 514 U.S. at 436, 115 S.Ct. at 1567.

█ *Brady* applies to both exculpatory and impeachment evidence, *see Giglio*, 405 U.S. at 154, 92 S.Ct. at 766, because "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence," *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Not every piece of impeachment evidence, however, meets the requirement of materiality.

---

41. Real world considerations make it difficult to accept the underlying premise that a former police officer would so willingly volunteer to speak to the defense, and they also

explain why the defense investigator would resort to a certain amount of chicanery to reach a police witness.

Evidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendants to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. Suppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.

*United States v. Amiel*, 95 F.3d 135, 145 (2d Cir.1996) (internal quotation marks and citations omitted); *see also Orena*, 145 F.3d at 559 ("It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." (citations omitted)).

■ Once defense counsel chose not to pursue a self-defense strategy,[42] there can be no question that the credibility of Torres and Modica was crucial in convicting petitioner. Their testimony alone put petitioner at the crime scene, and Torres was the only witness who testified that he clearly saw petitioner firing a gun. No other affirmative evidence of petitioner's guilt was presented at trial.[43] Nonetheless, the proffered impeachment evidence fails to rise to the level of materiality under *Brady* because petitioner cannot successfully argue that there was no other basis for attacking the two witnesses' testimony or that the evidence otherwise undermines confidence in the verdict.

In addition to arguing that weather conditions precluded a good identification of the gunman,[44] petitioner's trial counsel ably marshaled numerous discrepancies in Torres and Modica's testimony during cross-examination and in his closing argument. With respect to Modica, counsel argued that her testimony that she stared at the man in the double-parked car for the length of time she described—four to five seconds—without her boyfriend (now husband) noticing was implausible on its face. *See* T. 1729–37. Counsel continued with this theme by pointing out that in earlier testimony she had characterized her look at the man as a mere "glance." *See* T. 475, 1735. Counsel also argued that, based on the position of the victim's car, the gunman in the light-colored car could not have successfully ambushed the victim if the car had been double-parked in the position where Modica testified it was. *See* T. 1741–42, 1744–45. Counsel also questioned Modica's state of mind at the time she identified Leka from the photo array, observing that she had been awake for twenty-two hours and suggesting that she was, therefore, uncommonly susceptible to what he argued was an inherently suggestive photo array. *See* T. 515, 1743, 1763–64. Finally, counsel emphasized statements Modica had made which reflected some hesitancy in her photo array and line up identifications. Specifically, counsel observed that, when shown Leka's photo array, she commented that Leka would be the perpetrator "if he were 15 pounds heavier" and remarked, "Gee, he looks skinny." T. 509–12, 524, 1756–59. Later, at the precinct house line up, Modica stated that she was "choosing between two of them," and remarked of Leka, "Wow, I thought his body was bigger than it was." T. 516, 1765.[45]

---

**42.** *See supra* note 40.

**43.** Indeed, the trial judge conceded as much in his charge to the jury:

As you are now aware the only evidence which in any way establishes or tends to establish that the defendant, Leka, is the actual perpetrator ... is the testimony of the eye witnesses, Modica and Torres. Aside from their testimony that the defendant is the right man, there is no other evidence whatsoever which identifies Leka as the perpetrator.
T. 1896.

**44.** *See supra* note 12.

**45.** Perhaps tellingly, there was one avenue of impeachment trial counsel did not follow: During cross-examination of Modica, petitioner's counsel did not bring out the description, tape recorded statement, or drawing that Mo-

Trial counsel questioned the reliability of Torres' identification by emphasizing the brevity with which he had glimpsed the man outside the car and the fact that Torres had been in a "panicky" state of mind at the time. T. 663, 716, 1748–49. In support of this line of attack on Torres' identification, trial counsel read back fairly damning portions of the statement Torres' gave detectives in the early morning hours after the shooting. *See* T. 663–69, 677, 711–12, 1750, 1753, 1770. Trial counsel hammered away at the point that throughout the interview Torres repeatedly qualified his account of the man outside the car by stating that he "thought" he saw someone step out of the car. *See* T. 663–64, 666, 677, 1746–47, 1749. Indeed, on cross-examination, trial counsel forced Torres to concede that he did not actually see the man stepping out of the car. *See* T. 656. Furthermore, trial counsel noted that, when asked during the initial police interview whether he could recall what the gunman looked like, Torres answered "no" and explained "because it was real fast." T. 664, 669, 717, 1750. Later in the interview, Torres admitted: "I didn't get that good of a look." T. 711, 1753, 1770.

In addition, trial counsel highlighted the discrepancy between Torres' initial statement to the police that he did not see the gunman's hair and Torres' trial testimony in which he described the gunman's hairstyle in detail. *See* T. 658, 668, 712, 1753, 1770. Counsel suggested that at trial Torres was just repeating a description of the

gunman that his wife or the prosecutor had given him. *See* T. 1753, 1770.

Finally, trial counsel developed the theory that the man with a gun Torres had seen outside the car was actually Ferati, not Leka. *See* T. 1747, 1751–52. In support of the theory, counsel noted that during the interview at the precinct house in the early morning hours after the shooting Torres described the man he had seen outside the car as being five feet nine inches tall with a medium build. *See* T. 656, 679, 1751; Torres DD–5, *supra*. At the time of the murder, Ferati was five feet nine inches tall and weighed 165 pounds, and thus fit the description in those respects. *See* T. 905. Although there is some discrepancy in the evidence on record, Leka was by all accounts a much smaller man. According to a March 8, 1988 arrest report, Leka was five feet five inches tall and weighed 120 pounds, *see* Arrest Report dated 3/8/88, Resp.'s Supp. Mem., Ex. 4 [hereinafter Arrest Report], while Coney Island Hospital records indicate that he was only five feet three inches tall and weighed 115 pounds, *see* T. 1295.[46] In further support of the theory that Torres had mistaken Leka for Ferati, counsel observed that Torres told police detectives that the man he had seen was holding a black revolver with a brown handle. *See* T. 653–55, 853–55, 1747, 1752; Torres DD–5, *supra*. In fact, Ferati's gun was a black .44 caliber revolver with a brown handle, *see* T. 654, 747, 756, 971–72, whereas the actual murder weapon was a black, nine millimeter semi-automatic, *see* T. 839–41, 953, 960–63, 969–70.[47]

dica gave before viewing the photo arrays at the precinct house. Surely, had those documents had any impeachment value, e.g., had they described an individual different in appearance than Leka, trial counsel would have made some use of them on cross-examination. In fact, the documents were never offered into evidence, or described or recounted by any witness, and it is a fair assumption that they were consistent with Modica's identification of Leka from the photo array.

46. At trial, Torres addressed the fact that Leka was substantially smaller than the man he described to police with an explanation

that Leka looked taller on the day of the shooting because of the angle from which he viewed Leka, viz., crouching behind a car. *See* T. 656–57.

47. On the other hand, there was an equally glaring discrepancy between Torres' original description of the gunman and Ferati. Torres described the gunman as being in his late twenties or early thirties. *See* Torres DD–5, *supra*. Ferati was a much older man—fifty-three years old at his death. *See* T. 257; Resp.'s Supp. Mem. at 16. Leka, on the other hand, fit Torres' description in this respect;

The foregoing recitation makes it quite evident that petitioner had more than ample ammunition with which to impeach Modica and Torres' testimony. In light of the volume of the impeachment evidence presented to, and rejected by, the jury, the court's confidence in the jury's verdict is not undermined by the limited impeachment value of the three additional witnesses' expected testimony.

Indeed, it is not clear that Garcia and Gonzalez would have even provided a non-cumulative basis for impeaching Modica and Torres' testimony. Sali Ferati, the victim's brother, testified without qualification to exactly the same point that petitioner suggests can only be inferred from the proffered evidence of Garcia and Gonzalez. Namely, Sali Ferati testified that,

during the shooting, no one got out of the car.[48]

The only proffered evidence that potentially provides a non-cumulative basis for impeaching Torres or Modica is the bus driver Chiusano's statement that the light-colored car left the stop light at the end of the intersection at the same time he did. The impeachment value of the evidence, however, does not rise to the level necessary to find materiality under *Brady*. At most, the evidence shows that the car may have just pulled up when Modica glanced at its passenger, that the glance may have been quite brief, and that Modica and Torres perhaps walked something less than five car lengths ahead of the light-colored car when the shooting began.[49] Chiusano's statement does nothing to contradict or

he was thirty-two years old at the time. *See* Arrest Report, *supra*.

48. This last point brings out an unfounded assumption upon which petitioner's entire materiality argument with respect to Torres rests. Petitioner assumes that the jury credited Torres' testimony that the gunman stepped out of the car and disbelieved his theory that Torres actually only saw the victim, Rahman Ferati. The jury, of course, returned only a verdict, not detailed findings of fact. Thus, as far as the record reveals, the jury could have credited petitioner's theory with respect to Torres' identification and could have rested its verdict entirely on Modica's identification.

49. Judicial notice is taken of the fact that the block of Ocean Avenue in question—the block between Avenues N and O—is 900 feet long. *See* City of New York, Real Property Assessment Dep't, *Lot Map, Borough of Brooklyn* § 20, vol. 6, blocks 6731–6783, map 16. By way of reference, this block is approximately the same length as blocks between avenues on the West Side of Manhattan. The shooting took place at a point more than two-thirds of the way down the block from the intersection with Avenue N where Chiusano states that his bus and a light-colored car were stopped. To be precise, the distances from the intersection of Ocean Avenue and Avenue N to the northern and southern ends of the lot in front of which Ferati was shot—1954 Ocean Avenue—are 640 feet and 667 feet 7 inches, respectively. *See id.*

On various plausible sets of assumptions about the relative speeds of Chiusano's bus and the light-colored car, as well as the precise location of shooting, there would have

been enough time for the car to accelerate from the stop light at Avenue N and stop at 1954 Ocean Avenue, for the passenger in the car to exchange glances with Modica for four to five seconds, and for Modica to subsequently walk up to five car lengths, all before the bus arrived at 1954 Ocean Avenue.

For example, if the bus traveled down the block at an average speed of 10 miles per hour (equivalently, 14 ⅔ feet per second) and the faster accelerating car traveled at an average speed of 20 miles per hour (29 ⅓ feet per second), then depending on the precise point on the lot where the shooting took place and the precise distance behind the car the bus was situated when the shooting began (Chiusano stated in his affidavit that he was "approximately 50 feet or less" behind the car when the shooting began, Chiusano Aff. ¶¶ 5–6, Pet.'s Mem., Ex. 5), the car could have arrived at the crime scene anywhere from 18 to 23 seconds before the shooting began. If the car accelerated even faster—as Chiusano's statement that the car escaped his attention after leaving the intersection suggests, say, 30 miles per hour (44 feet per second), the car could have been stopped for anywhere from 26 to 30 seconds before the shooting began. Although lead times in the lower range of these figures would not have allowed Modica to walk as far as she estimated or observe the car's passenger for quite as long, lead times in the upper range of these figures would have given the car enough time to arrive at the crime scene before Modica ever glanced at its passenger, for Modica to view the passenger for four to five seconds, and for her to walk the full five car lengths she estimated. At an

explain away the most salient feature of Modica's testimony, viz., her placement of Leka in the passenger seat of a light-colored car in front of the murder scene just moments before the shooting. Moreover, Chiusano did not witness the end of the incident, and, therefore, his statement in no way impeaches Torres' identification of Leka as the gunman. Thus, even if Chiusano's testimony would have provided a non-cumulative basis for attacking Modica's testimony, his account of the events does not so undermine Modica's account as to overcome the presumption that additional bases for impeachment are not material evidence under *Brady*.

Moreover, if petitioner's counsel had presented Chiusano and subsequently ar-

gued to the jury that Chiusano's account proved that the shooting began immediately after the light-colored car stopped, he would have undermined the confession testimony of his own witness, Luftim Cira. Luftim Cira testified that the car had been stopped for "not more than *30 seconds* or so" before the gunfire began. T. 1439 (emphasis added).[50]

Similarly, this argument would also undermine the confession of Zeni Cira, whom petitioner now claims was the gunman. In an affidavit which petitioner submitted to the state courts as well as this court, Zeni Cira states:

> We [Zeni and Luftim Cira] drove down Ocean Avenue looking for a parking

average walking speed of two miles per hour (2.93 feet per second) and an average car length of 15 feet, a person can traverse one car length in about five seconds.

Thus, if the car sat for 30 seconds, Modica could have viewed its passenger for a full five seconds and walked the full five car lengths before the shooting began.

It is possible, therefore, to construct a sequence of events that would be consistent with all the salient features of *both* Modica's testimony and Chiusano's statement to the police. At most, Chiusano's testimony calls into question only the precise distance walked (five car lengths) and/or the precise duration of the glance (four to five seconds), which, it bears noting, Modica expressly gave only as estimates. *See* T. 383, 388, 537. Contrary to the argument of petitioner's counsel, Chiusano's statement just does not prove that "the account described by Modica [was] simply impossible." Pet.'s Supp. Mem. at 14.

For the same reasons, petitioner's counsel's suggestion that Chiusano's statement may actually be exculpatory must be rejected. As noted previously, counsel argues that if the jury credited both Chiusano's and Modica's testimony, the jury would be forced to conclude that Leka was not in the gunman's car but rather in a second light-colored car. *See id.* at 24. However, as just demonstrated, Modica's testimony can easily be reconciled with Chiusano's statement without recourse to a two-car theory.

Finally, since the time of his post-trial motions petitioner has argued that Zeni and Luftim Cira were in the car and that they committed the murder. It is worth noting that two other aspects of Chiusano's account—

aspects which petitioner and his counsel ignore—corroborate a theory that reconciles Modica's identification of Leka as the passenger in the front seat of the light-colored car with Luftim and Zeni's "confessions." Specifically, Chiusano told detectives that he saw "three, maybe four" people in the car and that the gunman was firing his weapon from the *back* passenger seat. Chiusano DD–5, *supra*. This would support the view that both Zeni and Leka, as well as Luftim, and possibly Osman Cira, were all in the car together and were acting in concert. *Cf.* Transcript of Sentencing Hearing held on May 31, 1990, at 12, 28 (trial court noting that even if Zeni Cira had confessed at trial to his role in the murder, jury could have still found that Leka acted in concert). In connection with this view, it should be pointed out that Luftim stated in his post-trial affidavit that he and Zeni set out to find Ferati with the intention of killing him. *See* Luftim Cira Aff. ¶ 3, Pet.'s Mem., Ex. 15. If Leka volunteered to ride along with Zeni and Luftim knowing their intention, he would clearly be guilty of acting in concert. Under this view, Chiusano's testimony would support Ferati's dying declaration naming Zeni, but would not exonerate Leka, whom Zeni claims was not even present. *See* Zeni Cira Aff. of 1/7/91, ¶ 15, Pet.'s Mem., Ex. 10.

**50.** Ironically, Luftim Cira's testimony actually tends to corroborate Modica's time line: Thirty seconds would appear to be more than enough time for Modica to have looked at the man in the double-parked car for about five seconds and then walked five car lengths before hearing gunshots. *See supra* note 49.

spot, made a u-turn at Avenue N and started slowly back to Avenue O, when Luftim say his [sic] Rahman Ferati, standing outside his car in the middle of the block. . . .

We pulled up to Rahman Ferati and he said in Albanian "You mother fucker, you came here too". [sic] He took his right hand to his belt and started to pull out a gun. At this moment, my brother, Luftim handed me a gun. . . . I pointed the gun at Rahman Ferati and started firing.

Zeni Cira Aff. of 5/7/90, at 2–3, Pet.'s Mem., Ex. 10. On Zeni Cira's account, the car had already pulled up to Rahman Ferati and remained there at least long enough for Ferati to curse its occupants and for them to fumble for a gun before any shooting began. Thus, Zeni Cira's confession would be equally impeached by the inference petitioner would draw from Chiusano's statement.[51]

Finally, as noted previously, Garcia's affidavit, which was apparently drafted by counsel for petitioner on his § 440.10 motion, states that Garcia saw the light-colored car "stop" in front of the victim *after* he heard the first shots fired. Garcia Aff. ¶ 4. To the extent that the use of the present tense of the verb "stop" faithfully reflects Garcia's account, Garcia's statement presents the same dilemma for petitioner as does his suggested reading of Chiusano's police report. If Garcia's statement was presented to the jury and the jury had credited it, Garcia's statement would have impeached not only Modica's testimony but also the confession—be it Luftim's or Zeni's—on which Leka's claim

of actual innocence rests. Thus, assuming for the sake of argument that Garcia's affidavit is accurate on this point, there is no reasonable probability that the jury would have acquitted Leka had they been presented with his testimony.

In sum, because the proffered evidence was neither suppressed nor material, petitioner's *Brady* claim is rejected.

(3)

Petitioner and his counsel each raise separate claims of ineffective assistance of trial counsel.[52] In his pro se memorandum, petitioner argues that his trial counsel, Joseph Benfante, was ineffective due to an actual conflict of interest stemming from the fact that Zeni Cira paid petitioner's legal bills. Petitioner's counsel contends that, should the court reject petitioner's *Brady* claim, there is "no other option" but to find Benfante ineffective for failing to call Chiusano, Garcia, and Gonzalez as part of petitioner's trial defense. Neither claim merits granting the writ.

### a. Conflict of Interest

In his pro se memorandum, petitioner claims that Benfante had a conflict of interest due to the facts that Benfante had previously represented petitioner and his co-defendant, Zeni Cira, and that after Zeni Cira's and petitioner's trials were consolidated and another lawyer took over Zeni Cira's case, Zeni Cira continued to pay petitioner's legal bills. *See* Pet.'s Mem. at 15. According to petitioner, because Cira was paying the legal bills, Benfante failed to call certain alibi witnesses who would have "exonerated [petitioner] and convicted [Zeni Cira]," failed to exer-

---

**51.** In addition, to the extent that Chiusano's statement suggests that the light-colored car had been proceeding south on Ocean Avenue when it stopped for the light at Avenue N, Chiusano's account also contradicts the statement in Zeni Cira's May 7, 1990 affidavit that he and Luftim made a U-turn on Ocean Avenue at its intersection with Avenue N before proceeding back toward Avenue O. In a later affidavit dated January 7, 1991, Zeni indicated that the U-turn was made in the block between Avenues M and N and that he and

Luftim then stopped for the light at Avenue N before proceeding to the crime scene. *See* Zeni Cira Aff. of 1/7/91, ¶ 18(c), Pet.'s Mem., Ex. 10. This second affidavit was, no doubt, an attempt to reconcile his previous account with that of the bus driver, Chiusano.

**52.** Petitioner filed his own pro se memorandum shortly before his current counsel took on his case pro bono.

cise "due diligence," and failed to conduct a complete investigation. *Id.* at 16, 19.

The District Attorney points out that petitioner produced Zeni Cira's brother Luftim, who testified that he and another brother (Osman) committed the murder. *See* Resp.'s Mem. at 33. This testimony exonerated both Zeni Cira and petitioner. The District Attorney also observes that petitioner's trial counsel wisely chose not to call three potential alibi witnesses—petitioner's wife, sister-in-law, and a brother with a felony conviction—both because it is professionally justifiable not to present an alibi defense based on the testimony of close relatives and because the failure to call witnesses is, in general, a tactical decision committed to counsel's discretion. *See id.* at 35.

There is no dispute that this claim was presented the state courts and adjudicated on the merits. Petitioner presented his conflict of interest claim to the trial court on both his motion to set aside the verdict and his motion to set aside the judgment, and to the Appellate Division on direct appeal. The claim was rejected at each stage.

In denying the post-verdict motion, the trial court emphatically rejected the suggestion that Benfante's representation had been anything less than diligent: "[Benfante] tried the case most diligently and vehemently. He tried his best to get this man acquitted. He tried like hell, I tell you that right now. And he still to this day believes in this man's innocence." Transcript of Sentencing Hearing held May 31, 1990, at 5–6, *quoted in* Pet.'s App. Mem. at 47. The trial court again rejected the claim in the context of the post-judgment motion noting that the petitioner's allegations were stated in conclusory terms and were contradicted by the Benfante affidavit that petitioner submitted in support of his post-judgment motion. *See* Section 440.10 Opinion, *supra*, at 10.

The Appellate Division subsequently affirmed on the ground that petitioner had not shown his defense was affected by the alleged conflict where "the moving papers established that trial counsel's failure to call the defendant's alibi witnesses was part of a reasonable trial strategy." *See Leka*, 209 A.D.2d at 725, 619 N.Y.S.2d at 146.

An ineffective assistance of counsel claim based on conflict of interest presents a mixed question of law and fact. *See Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). The state courts' decision on the claim can, therefore, be overturned on habeas review only if the decision was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) (Supp.1999).

There are two kinds of conflicts of interest: potential and actual. If a defendant establishes that his attorney had a potential conflict of interest, he must demonstrate prejudice in order to prevail on a claim that his Sixth Amendment right to effective assistance of counsel was violated. *See Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993). However, prejudice is presumed when a defendant establishes that his attorney (1) had an actual conflict of interest that (2) adversely affected the attorney's performance. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719; *Winkler*, 7 F.3d at 307. An actual conflict occurs when during the course of representation the attorney and defendant's interests "diverge with respect to a material factual or legal issue or to a course of action." *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3; *see Winkler*, 7 F.3d at 307. To demonstrate adverse effect, a defendant must establish that an "actual lapse in representation" resulted from the conflict. *Cuyler*, 446 U.S. at 336, 100 S.Ct. at 1711; *see Winkler*, 7 F.3d at 307. In order to show a lapse, a defendant must show (1) that there existed an alternative plausible defense strategy with sufficient substance to be a viable alternative, and

(2) that this defense strategy was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler*, 7 F.3d at 309.

■ Even giving petitioner the benefit of the doubt and assuming that Zeni Cira's continuing payment of legal fees created an actual conflict of interest, it cannot be said that the state courts' rejection of his ineffective assistance claim was contrary to, or involved an unreasonable application of, clearly established federal law.[53] Petitioner has not explained how Benfante failed to exercise due diligence or fully investigate the murder of Rahman Ferati, let alone connect any such alleged failures to any divided loyalty on Benfante's part. Petitioner submitted affidavits to the state courts that contain assertions by various members of the Albanian community that Zeni Cira's guilt was well-known and that everyone, including the Feratis, knew that petitioner was not involved in the murder. If these were offered as evidence of Benfante's failure to investigate the crime or exercise due diligence, they are unworthy of credence. The affidavits appear to be no more than attorney-created or inspired devices intended to exculpate petitioner and place the blame upon the now immune-from-prosecution Zeni Cira, and on Luftim Cira, whose confession the jury chose to ignore. That leaves only the failure to call certain alibi witnesses as a potential ground for a finding of ineffective assistance of counsel.

It was not unreasonable for the state courts to conclude that this alibi defense was either not viable or that Benfante's failure to pursue it was in no way related to any conflict of interest. The three alibi witnesses Benfante did not call—Catip Leka (petitioner's brother), Naze Alijaj (sister-in-law), and Shpresa Leka (wife)—provided affidavits detailing what their testimony would have been had they been called to the witness stand. *See* Catip Leka 1990 Aff., Pet.'s Mem., Ex. 14; Naze Alijaj Aff., Pet.'s Mem., Ex. 27; Shpresa Leka Aff., Pet.'s Mem., Ex. 30. Essentially, each of them corroborates the alibi that petitioner gave to the police, viz., that he was at home on the evening of the shooting except for a thirty minute trip to the video store with his sister-in-law Naze to rent a movie. Although this alibi defense might have been a viable alternative trial strategy, the proffered alibi testimony in no way inculpates Zeni Cira, or anyone else for that matter. Therefore, it cannot be said that this alibi evidence was inherently in conflict with Zeni Cira's interests or that Benfante failed to present it due to a conflict of interest arising from Zeni Cira's payment of his fee.

Accepting petitioner's argument that the failure to call these witnesses resulted from Benfante's alleged conflict of interest would require a shift away from an analysis of the effects of the conflict of interest to an across-the-board per se rule of prejudice, which has been explicitly rejected by the Second Circuit. *See Winkler*, 7 F.3d at 308. The already relaxed adverse effect standard applied in actual conflict of interest situations reflects a heightened sensitivity toward and scrutiny of those cases where a defendant may have suffered directly because of his lawyer's conflict of interest. It is designed to protect the

---

**53.** Although the Appellate Division apparently treated the claim as one of potential conflict, *see Leka*, 209 A.D.2d at 725, 619 N.Y.S.2d at 146 (discussing standard for vacatur based on a potential conflict of interest), this is not an indication that the Appellate Division applied an incorrect prejudice standard to petitioner's claim. The New York Court of Appeals interprets the state constitutional right to counsel more expansively than the federal right to counsel, applying an adverse effect standard even conflicts of interest arising out of multi-

ple representation that are merely potential. *See People v. Alicea*, 61 N.Y.2d 23, 30–31 & 30 n. *, 459 N.E.2d 177, 471 N.Y.S.2d 68, 71–72 & 71 n. * (1983); *see also People v. Ortiz*, 76 N.Y.2d 652, 657, 563 N.Y.S.2d 20, 23, 564 N.E.2d 630 (1990) ("[T]he requirement that a potential conflict have affected, or operated on, or borne a substantial relation to the conduct of the defense—three formulations of the same principle—is not a requirement that defendant show specific prejudice.").

defendant who might have received constitutionally adequate assistance of counsel but for the conflict of interest. It is not designed to force courts to read a conflict of interest into every move made by an attorney.

Petitioner's innocence was not inconsistent with Zeni Cira's innocence. Neither Zeni Cira nor petitioner were in a situation in which one had to foist the blame onto the other in order to avoid his own conviction. Indeed, both tried to foist the blame onto Zeni Cira's brother Luftim. If Benfante had really been affected by a conflict of interest between defending petitioner and protecting the source of his fee, it hardly seems likely that he would have chosen the route of implicating Zeni's brother. In light of the foregoing, the state courts' rejection of petitioner's conflict of interest claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, and it is therefore binding on habeas review. *See* 28 U.S.C. § 2254(d)(1) (Supp.1999).

**b. Actual Ineffectiveness**

■■■ Finally, petitioner's habeas counsel argues that Benfante was ineffective because he failed to use due diligence and avail himself of the potential testimony of Chiusano, Garcia, and Gonzalez. *See* Pet.'s Supp. Mem. at 38. According to petitioner's counsel, this court has "no other option" but to find that petitioner received ineffective assistance of counsel at trial if it finds that the prosecution did not suppress this evidence.

Petitioner raised this actual ineffectiveness claim only in passing in his brief to the Appellate Division. *See* Pet.'s App. Mem. at 78–79. Nonetheless, he did set forth the legal and factual basis for the claim; therefore, the claim will be deemed to have been fairly presented to the state courts. *See Daye*, 696 F.2d at 191. The Appellate Division, however, only gave an explanatory opinion with respect to the conflict of interest aspect of petitioner's ineffective assistance claim. *See Leka*, 209

A.D.2d at 725, 619 N.Y.S.2d at 146 (dismissing "remaining contentions" as "either unpreserved ... or without merit"). Again, for the same reasons discussed in the context of petitioner' police coercion claim, *see supra* § 1(b)(ii)-(iii), the court will review this mixed question of law and fact de novo. *See Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070 (actual ineffective assistance claim presents mixed question).

Ineffective assistance of counsel claims that do not involve a conflict of interest are analyzed under the familiar *Strickland* framework, which requires a defendant to show "(1) that his attorney's performance fell below an 'objective standard of reasonableness,' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Kieser v. New York*, 56 F.3d 16, 18 (2d Cir.1995) (quoting *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068). However, "[b]ecause of the difficulties inherent in [evaluating an attorney's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Habeas counsel's attempt to create an irreconcilable dilemma in which the court has "no other choice" but to find trial counsel ineffective has two fatal flaws, either of which is sufficient to defeat the argument: First, it glosses over the first prong of the *Strickland* standard which requires an objective deficiency in performance; and second, it assumes that the evidence of the three witnesses material. For the reasons stated above, the evidence was not material. *See supra* § (2)(e). As to the first point, petitioner would infer objectively deficient performance by trial counsel from the state court's finding that the witnesses could have been located through duly diligent investigative work. Agreement with the state court finding does not compel acceptance of habeas counsel's inference.

The record does not show that Benfante tried throughout the trial to find the three witnesses but failed because of investigative incompetence. Rather, Benfante began to seek out Gonzalez and Garcia but, during the course of the trial, apparently made a tactical decision not to call the witnesses. Moreover, there is no evidence in the record that trial counsel ever sought out Chiusano. The state court's finding that these witnesses could have been located through the exercise of due diligence came in the context of the post-trial attempt of a different attorney to win a new trial based on an alternative trial strategy that focused on impeaching Modica and Torres' time line. Ordinarily, decisions as to trial strategy, including which witnesses to call, fall entirely within trial counsel's professional discretion. Nothing on the record or in habeas counsel's submissions overcomes the "strong presumption" that Benfante's performance fell within the "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

On the contrary, a review of the record compels agreement with the trial judge that Benfante put on a vigorous, threepronged defense that very well could have been credited by the jury, but simply was not. Benfante presented medical evidence which included the record of a clinic visit just two days before the shooting in an effort to show that petitioner's arthritis was so severe that he could not physically participate in the murder. As has already been described at length above, Benfante also presented a forceful attack on Modica and Torres' identifications based on inconsistencies in the testimony they gave at various stages of the prosecution and on physical evidence, such as his comparison of the two guns. Finally, Benfante presented a witness, Luftim Cira, who confessed to the crime before the jury. In light of this comprehensive, albeit unsuccessful, trial strategy, counsel's argument that Benfante's failure to present the time line evidence of Chiusano, Garcia and Gonzalez was objectively unreasonable, in effect, invites a habeas court to indulge in precisely the type of hindsight judgment that *Strickland* requires habeas courts to studiously avoid.[54] The invitation is declined.

### Conclusion

■ Despite Sami Leka's claim of actual innocence, there is little evidence to support the claim and much to negate it, including an implausible alibi.[55] The fact

---

**54.** As the Supreme Court has explained:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

**55.** Petitioner's claim of innocence is also undermined by the post-trial "confession" of his acquitted brother-in-law, Zeni. In none of the three affidavits that he has submitted in support of Leka's § 330.30 and § 440.10 motions, did Zeni offer to waive his double jeopardy defense and plead guilty to a new indictment, *see* Zeni Cira Aff. of 5/7/90, Pet.'s Mem., Ex. 10; Zeni Cira Aff. of 1/7/91, Pet.'s Mem., Ex. 10, Zeni Cira Aff. of 2/7/91, Pet.'s Mem., Ex. 9, although Leka's then-counsel represented at the sentencing hearing that Zeni was prepared to do so, *see* Transcript of Sentencing Hearing held on May 31, 1990, at

4. Had Zeni done so, it would have given his confession at least a veneer of credibility and less the air of an attempt to manipulate the legal system for the benefit of his convicted brother-in-law.

This is especially so when one considers the details of Zeni's original account—that he and Luftim "pulled up" to Ferati, that Ferati cursed them, and that he and Luftim fumbled for a gun all *before* the shooting began. *See* Zeni Cira Aff. of 5/7/90, at 2–3. This account directly contradicts the inference that petitioner's counsel, in his attack on Modica's identification, urges this court to draw from Chiusano's statement, viz., that the murderer's car did not stop or did not have time to stop before the shooting began. *Compare id.* at 2–3, *with* Pet.'s Supp. Mem. at 14, 24. Moreover, as the trial court noted in its Section 440.10 Opinion, there are significant contradictions among the three affidavits, e.g., concerning whose gun—Luftim or Zeni's— was used in the shooting. *See* Section 440.10 Opinion, *supra,* at 6–8.

that the proof adduced at trial was not overwhelming does not establish that the jury's verdict resulted in the conviction of an innocent man. In any case, absent a constitutional violation, petitioner's claim of actual innocence is not a ground for habeas relief. *See Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 862–63, 122 L.Ed.2d 203 (1993). Petitioner, however, has not shown that he was convicted due to impermissible identification procedures, nor has he shown a violation of the prosecution's duty to disclose exculpatory evidence or ineffective assistance of counsel at trial.

Accordingly, the petition is denied. A certificate of appealability will not issue since petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c) (Supp. 1999); *Soto v. United States,* 185 F.3d 48, 51 & n. 3 (2d Cir.1999). The Clerk of the Court is directed to enter judgment and close the case.

SO ORDERED.

## MEMORANDUM AND ORDER DENYING PETITIONER'S MOTION FOR A CERTIFICATE OF APPEALABILITY

The strange facts of this case arise out of a feud within the Albanian immigrant community of Brooklyn.[1] In 1990, petitioner Sami Leka ("Leka") was convicted in New York Supreme Court for the feud-related murder of his brother-in-law's father-in-law. On November 30, 1999, this court issued a Revised Memorandum and Order, denying Leka's application for a writ of habeas corpus. *See Leka v. Portuondo,* 76 F.Supp.2d 258 (E.D.N.Y.1999). The order also declined to issue a certificate of appealability because petitioner had

not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253 (Supp.1999). By letter brief dated December 8, 1999, petitioner moves the court to reconsider its denial of a certificate of appealability. Specifically, petitioner argues that he has made a substantial showing that the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by allegedly suppressing the testimony of the former police officer Wilfredo Garcia ("Garcia"). For the reasons that follow, this court will adhere to its previous ruling.

### (1)

The factual background of this case has been fully detailed in this court's Revised Memorandum and Opinion, familiarity with which will be assumed. Petitioner argues that, with respect to Garcia, he has made a sufficient showing of both suppression and materiality to warrant a certificate of appealability on the alleged *Brady* violation.

■■■ In order to find a "substantial showing" of a denial of a constitutional right within the meaning of 28 U.S.C. § 2253, an appeal must present at least one issue (1) that is "debatable among jurists of reason;" (2) "that a court could resolve in a different manner;" (3) that is "adequate to deserve encouragement to proceed further;" or (4) that is not "squarely foreclosed by statute, rule, or authoritative court decision, or . . . [that] is not lacking any factual basis in the record." *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394 n. 4, 77 L.Ed.2d 1090 (1983); *accord Lozada v. Deeds,* 498 U.S. 430, 432, 111 S.Ct. 860,

---

Finally, to the extent that Garcia's affidavit, drafted by petitioner's § 440.10 counsel, accurately reflects what he observed—viz., that he heard shots before seeing the car stop—his affidavit creates an even more blatant discrepancy than that between Zeni's confession (whichever version one chooses) and Chiusano's account. *See* Garcia Aff. ¶ 4. *See generally supra* notes 50–51 and accompanying text

(comparing Luftim and Zeni's confessions with Chiusano and Garcia's accounts of the shooting).

1. *See generally* Scott Anderson, *The Curse of Blood and Vengeance,* N.Y. Times Magazine, Dec. 26, 1999, at 28 (discussing the Albanian blood feud tradition).

862, 112 L.Ed.2d 956 (1991).[2] As discussed below, petitioner does not meet the substantial showing standard with respect to either the suppression or materiality of the Garcia evidence.

## A. Suppression

Although petitioner acknowledges that a defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence,' " *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618, (2d Cir.1982)) (alteration added), petitioner argues that this court's recital of the facts surrounding defense counsel's opportunity to interview Garcia focused on a collateral issue. Petitioner asserts that *Brady* and its progeny place an "affirmative duty" on the prosecution to disclose exculpatory or impeachment evidence and that, as a result, it is irrelevant whether defense counsel could have gained access to Garcia by means independent of the prosecutorial disclosure. Letter from Michael S. Sommer to Chambers of 12/8/99, at 2–3 [hereinafter Pet.'s Letter Br.]. Petitioner claims that the prosecutor did not meet its affirmative duty because "there was no disclosure at all of what Garcia had seen." *Id.* at 3.

Petitioner's argument is mistaken both as to the law under *Brady* and as to the facts of the alleged suppression. The Second Circuit has, indeed, noted that "[u]nder *Brady* and its progeny, the [prosecution] has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 1565, 1567–68, 131 L.Ed.2d 490 (1995);

*United States v. Agurs*, 427 U.S. 97, 108–110, 96 S.Ct. 2392, 2399–2401, 49 L.Ed.2d 342 (1976)). However, the Second Circuit has clarified that its holding in *Zackson* announces an exception to the definition of "suppression" and, hence, to the prosecutor's disclosure duty under *Brady:*

> Nonetheless, evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.' " *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)). Thus, where a defendant and his codefendant had agreed to share information about their respective cases, and the defendant's attorney had made representations indicating his awareness of the codefendant's cooperation with the prosecution, the government's failure to disclose a government agent's statements concerning the scope of that cooperation was not a suppression within the meaning of *Brady*. *See United States v. Zackson*, 6 F.3d at 919. *See also United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990) (no *Brady* violation by nondisclosure of witness's testimony as to a fact within personal knowledge of defendant), *cert. denied*, 500 U.S. 925, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991); *United States v. Esposito*, 834 F.2d 272, 275 (2d Cir.1987) (no *Brady* violation where defendant had possession of transcripts containing the pertinent material). Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.

---

**2.** Although the *Barefoot* opinion defined the standard for issuance of a certificate of probable cause under the pre-AEDPA version of 28 U.S.C. § 2253, the Second Circuit has clarified that the substantive standard for issuing a certificate of appealability under the AEDPA is the same. *See Nelson v. Walker*, 121 F.3d 828, 832 n. 3 (2nd Cir.1997); *Reyes v. Keane*, 90 F.3d 676, 680 (2d Cir.1996).

*See, e.g., United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975) (state's investigative files were not suppressed since defense counsel, who represented one of the defendants in the state proceedings, could have discovered them "with the exercise of due diligence"), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

*Payne,* 63 F.3d at 1208–09; *see also id.* at 1209 (discussing whether facts of the case demonstrated that "the government's *duty* to produce [a particular] affidavit *was eliminated* by that document's availability in a public court file" (emphasis added)). Thus, the Second Circuit has made it clear that the prosecutor's duty under *Brady* is affirmative only in the sense that the prosecutor must disclose material exculpatory or impeachment evidence to the defense even in the absence of a specific request by the defense. Contrary to petitioner's argument, the *Brady* duty is not affirmative in the sense that a prosecutor's failure to disclose evidence qualifies as a constitutional error even if the evidence was already in the possession of the defense or was, upon exercise of reasonable diligence, available to the defense through other sources.

The reason is that the *Brady* duty arises from the necessity of ensuring that defendant's trial comports with due process. *See United States v. Bagley,* 473 U.S. 667, 673, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) ("The *Brady* rule is based on the requirement of due process."). As such, the dispositive question in determining whether a verdict should be set aside on grounds of non-disclosure is whether the prosecutor's "omission deprived the defendant of a fair trial." *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399. If all material evidence is in a defendant's possession or is available to him through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence.

It is true that extending the right to a new trial in all cases where the prosecutor failed to make disclosure of material evidence (including those where the defense had the evidence anyway) might serve to ensure better compliance with the *Brady* rule among prosecutors. However, nothing in *Brady* or its progeny suggests that the Supreme Court has found prosecutorial misconduct with respect to disclosure to be a problem sufficiently pervasive to justify a rule that would require affording a new trial to a defendant who in fact did receive a fair first trial. Absent such a pronouncement from the Supreme Court, existing precedent does not support finding a breach of the prosecution's duty under *Brady* where the defendant is actually or constructively in possession of the allegedly "suppressed" evidence.

Furthermore, leaving aside petitioner's misapprehension of the scope and consequences of the *Brady* disclosure duty, in this case there simply was nothing for the prosecutor to disclose other than the fact that Garcia was an eyewitness to the crime. It is blackletter law that the duty to disclose only encompasses evidence in the prosecution's possession or control. *See Morgan v. Salamack,* 735 F.2d 354, 358 (2d Cir.1984) ("Clearly the government cannot be required to produce that which it does not control and it never possessed or inspected." (citations and internal quotations omitted)). Here, the prosecutor represented to petitioner's trial counsel that Garcia had not testified before grand jury, did not take notes on the incident, did not complete a DD–5, and did not give any other recorded statement to the police or the district attorney's office. *See* Joseph R. Benfante Aff. ¶ 18, Pet.'s Supp. Mem., Ex. 7. Although petitioner's trial counsel finds these representations incredible, *see id.* ¶¶ 18–19, there is no evidence in the record to suggest that such documents do exist.[3]

**3.** Nor does the court agree with trial counsel's speculation. There is nothing incredible

Pertinently, in his affidavit, Garcia does not indicate that he made any notes about the shooting or that anyone from the police department or the district attorney's office recorded any statement that he made regarding the incident. *See* Garcia Aff., Pet.'s Supp. Mem., Ex. 8 [hereinafter Garcia Aff.] On the contrary, Garcia expressly stated that he "had not made any notes of this incident" and that after identifying himself to a uniformed officer, turning over the victim's revolver, and speaking to a lieutenant from the 70th Precinct at the crime scene, his "involvement was limited." *Id.* ¶¶ 12–13.

In a similar vein is an affidavit submitted by petitioner's counsel which recounts an interview that Garcia gave for a CBS news program. *See* Mary E. Mullins Aff., Pet.'s Supp. Mem., Ex. 6. According to the affidavit, Garcia told the reporter that "he was interviewed by the police officers who investigated the incident [perhaps referring to the officers to whom he spoke at the crime scene], and that he was informed by the Assistant District Attorney who was prosecuting Mr. Leka that he did not need to testify at the trial." *Id.* ¶ 6. The affidavit does not indicate that the assistant district attorney or the police officers recorded any statement that he gave them. *See id. passim.* Accordingly, I concluded

(and continue to conclude) that there was no documentary evidence relating to Garcia with respect to which the prosecution failed to exercise its disclosure obligations under *Brady*.

In light of the absence of such documentary evidence, this court assumed in the Revised Memorandum and Order that petitioner's argument was that the prosecution should have at least identified Garcia as a witness who might have exculpatory or material impeachment evidence. Or, as petitioner's counsel now puts it, the prosecution should have at least given "some cryptic notice to the defense that Garcia was a person that the defense should speak with." Pet.'s Letter Br. 2. There is no evidence that the prosecutor did not comply with this limited disclosure duty in the absence of pertinent documentary evidence. During the *Wade* hearing, the prosecutor apparently revealed that Garcia was an eyewitness to the shooting, but that he could not identify the shooter. *See* Transcript of Wade Hearing held Feb. 20–21, 1990, at 197. There is no evidence on record that the prosecutor or any police investigators on the case knew any additional details about Garcia's account, nor has petitioner produced any such evidence.[4] Perhaps, what is decisive here is

---

about the notion that the police or district attorney would not take the time to record a written statement of a police officer who, like Garcia, stated that he could not identify the perpetrator of the crime.

4. *See Kyles,* 514 U.S. at 437–439, 115 S.Ct. at 1567–68 (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Payne,* 63 F.3d at 1208 ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." (citing *Kyles,* 115 S.Ct. at 1567)). As discussed above, there is no indication in the record that any police investigator on this case recorded any statement by Garcia or that Garcia even recited to investigators the aspects of his account that petitioner claims are material. Consequently, there is no basis in the record for charging the prosecution with

constructive knowledge of such evidence under *Kyles.* On this point, it should be noted that Garcia's own knowledge of what he witnessed cannot be directly imputed to the prosecutor simply because Garcia was a police officer. Knowledge possessed by a police officer can be attributed to the prosecutor only "if the officer acted as an arm of the prosecution." *Wedra v. Thomas,* 671 F.2d 713, 717 n. 1 (2d Cir.1982) (citing *United States v. Morell,* 524 F.2d 550, 554 (2d Cir.1975)). *Compare Kyles,* 514 U.S. at 423–29, 437–38, 115 S.Ct. at 1560–63, 1568 (detectives' knowledge of withheld documents imputed to prosecutor where detectives in question were the lead detectives on the case), *with United States v. Morris,* 80 F.3d 1151, 1169–70 (7th Cir.1996) (knowledge of documents in possession of SEC, IRS and Office of Thrift Supervision not imputed to U.S. attorney under *Kyles* where those agencies were not involved in the U.S. attorney's investigation). Here, Garcia was not involved in the investigation of the Ferati

that neither Garcia's affidavit nor the Mullins' affidavit makes any claim that Garcia told the assistant district attorney or police investigators about either of the two aspects of his account that petitioner now claims were so material, viz., that Garcia never saw anyone get out of the car during either of the two times he looked out his window,[5] and that Garcia heard shots before looking out his window and seeing the car "stop" in a diagonal position in front of the victim. *See* Garcia Aff. ¶¶ 4–6; Mullins Aff. ¶ 6. Thus, one can only find that the prosecutor made as full a disclosure as was possible with respect to Garcia. As noted in the Revised Memorandum and Order, petitioner's failure to make use of this disclosure cannot ground a claim that the prosecution suppressed Garcia's evidence.

## B. Materiality

In his letter brief, petitioner largely restates previous arguments regarding the materiality of Garcia's account that were fully addressed in the Revised Memorandum and Order. Petitioner does, however, raise two new arguments, each of which is considered in turn below.

First, petitioner now argues that Garcia's affidavit statement that he did not see anyone get out of the car while he was watching was not merely cumulative of Sali Ferati's testimony because Sali Ferati had "substantial credibility problems." Pet.'s Letter Br. 3. Petitioner bases his predicate assertion that Sali Ferati had credibility problems on the fact that the jury acquitted Zeni Cira. From Zeni's acquittal, petitioner infers that the jury rejected that Sali Ferati's testimony regarding Rahman Ferati's dying declaration. Petitioner then implictly suggests that the jury may have found Sali Ferati's testimo-

ny that no one got out the car incredible as well.

While the first inference regarding the jury's assessment of Sali Ferati's dying declaration testimony is a fair one, the second is not. Presumably, the perceived credibility problem would be that the prosecution witness Sali Ferati was biased against Zeni Cira, and perhaps against Leka as well. To the extent that Sali Ferati's testimony that no one got out of the car favored Leka by impeaching the account given by another prosecution witness, Elfren Torres ("Torres"), his testimony on that point would actually be highly credible in light of his presumed bias against the defense. Although it has been suggested that, in extraordinary cases, a dramatic difference in credibility between a suppressed witness and an actual witness may render otherwise cumulative evidence material, *see Commonwealth v. Tucceri*, 412 Mass. 401, 414, 589 N.E.2d 1216, 1224 (1992), this case does not present facts that would rebut the presumption that cumulative evidence is not material under *Brady*, *see United States v. Amiel*, 95 F.3d 135, 145 (2d Cir.1996). Whatever credibility problems the *prosecution* witness Sali Ferati had could not reasonably be judged to have come into play in the jury's assessment of testimony that he gave that was favorable to the *defendant* Leka.

At any rate, the previous opinion should not be read to suggest that the only consideration that defeats petitioner's materiality argument on this point is the fact that Garcia's account would have been cumulative of Sali Ferati's testimony. The argument is further stymied by the fact that Garcia's account does not actually contradict Torres' testimony at all. Garcia's account could only impeach Torres if Garcia had witnessed the end of the shooting. According to Torres, the final shots were

---

murder. *See* Garcia Aff. ¶ 12. Accordingly, his status as police officer does not by itself furnish a ground for imputing knowledge of his account to the prosecutor.

**5.** In his affidavit, Garcia states that he observed the shooting from his apartment window at two separate points—once, just after the shooting started, and again, sometime roughly in the middle of the incident. *See id.* ¶¶ 4–6.

fired by a man standing outside the light-colored car. In contrast, Garcia stated that he did not see the last shots fired, because he was running down the stairs in his apartment building when he heard them. *See* Garcia Aff. ¶ 6. Thus, there is simply no inconsistency between Garcia's account and Torres' on this point, and, hence, Garcia's account has no impeachment value with respect to Torres, material or otherwise.

Petitioner's second new argument might best be characterized as an argument that Garcia's account was, for lack of a better term, "indirectly" material. Petitioner points to discussion in the prior opinion to the effect that Leka's trial counsel had made a strategic decision not to call the eyewitnesses Anthony Chiusano and Joseph Gonzalez. *See* Revised Mem. & Order at 57, 58 n. 40, 83. Petitioner argues that the prosecutor's alleged suppression of Garcia deprived trial counsel of the facts necessary to make an informed judgment about whether to call Chiusano and Gonzalez. Petitioner suggests that if trial counsel had known the substance of Garcia's account, his strategic decisions would have been significantly different. Trial counsel would have endeavored to call, not only Garcia, but Chiusano and Gonzalez as well. Collectively, asserts petitioner, these three witnesses' testimony would have so altered the balance of evidence adduced at trial that there is a reasonable probability the outcome would have been different. *See* Pet.'s Letter Br. at 4. *See generally Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384 (opinion of Blackmun, J.) ("[U]nder the *Strickland* formulation [of the materiality standard] [a] reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had

on the preparation or presentation of the defendant's case.").

To the extent that this argument is properly viewed as an argument about materiality (rather than an argument that another trial strategy might have fared better with the jury[6]), it must be rejected when one considers, as one must, the probable impact of the evidence in light of the defense theories actually pursued at trial. Evidence is material only if it "could reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." *See Kyles,* 514 U.S. at 437, 115 S.Ct. at 1566 (emphasis added). As a result, "the character of a piece of evidence as favorable will often turn on the *context* of the existing or potential evidentiary record." *Id.* (emphasis added).

In this case, petitioner did not merely attempt to impeach Torres and Carolyn Modica Torres' ("Modica") identifications; he also presented an alternative, exculpatory account of the shooting, viz., Luftim Cira's in-court confession to the murder. As discussed in the previous opinion, *see* Revised Mem. & Order at 72–74, Chiusano and Garcia's testimony would have impeached Luftim Cira's confession just as much as, if not more than, Torres and Modica's identifications. To recapitulate, petitioner argues that one can infer from Chiusano and Garcia's accounts of the shooting that the car carrying the gunman did not stop before, or had only just stopped when, the shooting began. Thus, petitioner argues, their testimony would have impeached Modica's testimony that the gunman's car was parked on Ocean Avenue and that she stared at a passenger in the car (whom she identified as Leka) for four or five seconds before the shooting

---

**6.** The mere possibility that an alternative trial strategy may have benefitted the petitioner is not by itself grounds for granting a writ of habeas corpus. *Cf. Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (holding that failure to pursue particular trial strategy is a ground for habeas relief only if the failure reflected an objectively unreasonable performance by defense counsel); *Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (holding that failure to pursue a viable, alternative defense strategy is grounds for habeas relief if it results from an actual conflict of interest).

started.[7] The difficulty for petitioner is that this inference would have also severely undermined the exculpatory account given by Luftim Cira, who stated that he was in the car and that it had been parked for up to thirty seconds before the shooting began. *See id.* at 72. In light of these facts, one cannot reasonably find that there would have been any net increase in the jury's estimation of Leka's innocence if it had heard Chiusano and Garcia's testimony.

■ Petitioner responds to this point, essentially, by noting that the jury does not appear to have found Luftim Cira credible anyway. *See* Pet.'s Letter Br. 4. If the suggestion is that any further damage done to the credibility of Luftim Cira's confession would not have affected the jury's verdict, the point is not well taken. Although a jury is not allowed to draw adverse inferences from a defendant's decision not to testify, *see Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), a jury is entitled to draw adverse inferences from the presentation of a false alibi, *see United States v. LaVallee,* 521 F.2d 1109, 1113 (2d Cir. 1975), or false exculpatory statements, *see United States v. Clark,* 45 F.3d 1247, 1250 (8th Cir.1995). If, in addition to Luftim Cira's inability to recount basic details of the shooting, *see* Revised Mem. & Order at 12 n. 14, his testimony had been contradicted by the testimony of other *defense* witnesses, the adverse inferences the jury was entitled to draw against Leka would only have been strengthened.

Of course, petitioner has since disclaimed any reliance on Luftim Cira's confession, having submitted affidavits in which Luftim recants his trial confession. Nevertheless, the present point is in no way diminished, because Leka now asserts a claim of innocence based on Zeni Cira's post-trial confession. If presented at trial, Zeni Cira's confession would also be impeached by the "favorable" inferences petitioner argues the jury would draw from Garcia and Chiusano's testimony. *See id.* at 72–74. As did Luftim's confession, Zeni Cira's confession gives an account of the incident in which the car was parked for some length of time before the shooting began. *See id.* at 73. Thus, if Leka were to present Garcia and Chiusano's testimony at a new trial along with Zeni Cira's confession and the jury were to draw the desired inferences from Garcia and Chiusano's testimony, the jury would be entitled to draw an adverse inference from the implied falsity of Zeni Cira's confession just as it could from a defense based on Luftim Cira's confession.

Effectively, petitioner's current argument about the impact the Garcia disclosure would have had on trial counsel's strategy boils down to an argument that, taken cumulatively, the allegedly suppressed evidence creates a reasonable probability of a different outcome. As the Supreme Court explained in *Kyles,* suppressed evidence indeed should be considered "collectively, not item by item." *Kyles,* 514 U.S. at 437, 115 S.Ct. at 1567. The fatal problem with petitioner's argument is that the cumulative effect of the inference he urges the jury might draw from the Garcia and Chiusano evidence cannot reasonably be characterized as favorable to him in light of its adverse impact on the confessions upon which Leka

---

**7.** Again, it bears emphasis that petitioner's entire argument with respect to Garcia is predicated on an assumption that the use of the present tense of the verb "stop" in an affidavit drafted by petitioner's state appellate counsel accurately reflects Garcia's account. *See* Revised Mem. & Order at 73–74 (discussing Garcia Aff. ¶ 4). Petitioner's present counsel further embellishes Garcia's account by stating that Garcia saw the white car "rolling to a stop" after the first shot. Pet.'s Reply Mem. at 8. Nothing in Garcia's affidavit supports this characterization of his observations. Of course, if what Garcia meant to say was that he heard gunshots, looked out his window, and then saw a white car "stopped" in a diagonal position in front of the victim, petitioner's theory as to the materiality of Garcia's account completely collapses.

has successively based his claim of innocence.[8]

Accordingly, there remains no basis on which to conclude that petitioner has made a "substantial showing" of a *Brady* violation.

(2)

Although in his letter brief of December 8, 1999, petitioner only argues for reconsideration of the Garcia *Brady* issue, in an earlier communication to the court petitioner had indicated that he intended also to move for reconsideration of the denial of the certificate of appealability with respect to his claim of ineffective assistance of counsel due to an actual conflict of interest. In subsequent communications, petitioner's counsel clarified that petitioner no longer seeks reconsideration with respect to the actual conflict claim. Nonetheless, because certain issues with respect to the actual conflict claim were not fully explored in this court's Revised Memorandum and Order, the court will take this opportunity to expand its analysis of the claim.

As noted in the previous opinion, to prevail on an actual conflict of interest, petitioner must show that the conflict of interest had an adversely affected his defense. *See Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). Specifically, petitioner must show that there was a viable, alternative trial strategy that trial counsel failed to pursue because of his divided loyalties. *See Winkler*, 7 F.3d at 309.

In this case, Leka claims that his trial counsel, Joseph Benfante ("Benfante"), labored under an actual conflict of interest because Leka's codefendant Zeni Cira paid Benfante's fees. Leka argues that, as a result of this conflict, Benfante failed to present three viable alibi witnesses— Leka's wife, brother, and sister-in-law— who would testify that petitioner was at home and sick at the time of the murder except for a short trip to the video store with his sister-in-law. However, as was detailed in the previous opinion, Benfante did in fact present the alibi that Leka was too physically incapacitated to commit the crime, though he did so through the introduction of medical records and testimony by two of Leka's neighbors and one of his friends that Leka had been sick all week. *See* Revised Mem. & Order at 12–13. Benfante had good reason not to employ close relatives to make this defense because of their obvious bias in favor of Leka. Moreover, by not presenting his close relatives' testimony, Benfante, no doubt, hoped to avoid having to explain the apparent inconsistency between the claim that Leka was bedridden and the fact that Leka went on a trip to the video store.[9] Most importantly, there was no evidence that the failure to present the three alibi witnesses resulted from the alleged conflict of interest, because Leka's alibi did not inculpate Zeni Cira even in slightest degree. *See id.* at 75–81. Accordingly, as found in the previous opinion, the state courts' rejection of Leka's actual conflict of interest claim was not contrary to, nor did it involve an unreasonable application of,

8. It will not avail the petitioner to argue that on retrial he will rely entirely on a misidentification defense and not present either of the Cira confessions. Even if Leka does not present them, the prosecution will be entitled to show as evidence of consciousness of guilt that Leka previously and knowingly offered an admittedly false trial defense (viz., Luftim Cira's confession). *See People v. Johnson,* 61 N.Y.2d 932, 934, 474 N.Y.S.2d 967, 969, 463 N.E.2d 368 (1984) (evidence of pattern of inconsistent, and sometimes false, exculpatory stories was properly admitted against defendant as indicative of consciousness of guilt);

*see also People v. Koestler,* 176 A.D.2d 1207, 1208, 576 N.Y.S.2d 705, 706 (4th Dep't 1991) ("Resort to falsehood ... constitutes an implied admission of guilt." (citations omitted)).

9. Ultimately, this inconsistency was brought out during the prosecution's rebuttal. Detective James Sanseverino testified that, during an interview on the day after the murder, Leka gave the alibi that he was at a video store with his sister-in-law at the time of the murder. *See* Revised Mem. & Order at 5, 13–14.

clearly established federal law. *See id.* at 81; 28 U.S.C. § 2254(d)(1) (Supp.1999).

It bears noting that had the defense of this case been different—and probably one that was closer to the truth—petitioner might well have been able to present a meritorious actual conflict claim. There is evidence that Leka was in the light-colored car involved in the shooting, but that he was not the gunman. *See* Revised Mem. & Order at 69 n. 49. If that was in fact the case, then a viable, alternative defense strategy would have been for Leka to admit that he was in the car, but that he was not the one who shot Rahman Ferati and, furthermore, that he did not know that Zeni Cira (who confessed to the murder after his acquittal) or the other occupants of the car, if any, intended to kill Rahman Ferati when they set off for Sali Ferati's apartment. Leka could have claimed that, as far as he knew, the object of the visit was merely to retrieve Luftim Cira's children. On this theory, which is consistent with the accounts given by Chiusano, Gonzalez, *and Modica,* Leka could well have been acquitted of acting in concert with the gunman. Inasmuch as this theory would have required Leka to acknowledge Zeni Cira's involvement in the crime, the nexus between trial counsel's failure to pursue this defense and his alleged conflict of interest would have been manifest.

There is no evidence, however, that Leka ever alerted Benfante to the possibility of such a defense, or, indeed that he even acknowledged to Benfante his presence at the crime scene. On the contrary, several of the affidavits Leka has submitted in connection with his state court appeal and this petition expressly state that the Cira family—with Leka's knowledge and tacit cooperation—agreed to deceive the defense attorneys as to the true facts of the case in the hope that both defendants could escape conviction. *See* Zeni Cira Aff. of 2/7/91, at ¶¶ 3–6, Pet.'s Mem., Ex. 9; Zeni Cira Aff. of 5/7/90, at 3–4, Pet.'s Mem., Ex. 10; Luftim Cira Aff. of 1/7/91, at ¶ 8, Pet.'s Mem., Ex. 15; ; *see also* Joseph R. Benfane Aff. ¶¶ 5–8, Pet.'s Supp. Mem., Ex. 7 (stating that he had been lied to by the Ciras and denying that he knew Zeni Cira's role in the shooting). *But see* Zeni Cira Aff. of 1/7/91, at ¶ 16, Pet.'s Mem., Ex. 10 (stating that "Mr. LEKA's lawyer knew that it was my brother LUFTIM and I who committed this murder"). Moreover, even in these affidavits, Leka never admits to his presence in the car during the shooting.

As the trial judge aptly noted in his opinion denying Leka's N.Y. C.P.L. § 440.10 motion, "Leka knew throughout this proceeding of the alleged 'cover up', lying, and fraud being perpetrated on the Criminal Justice System. Defendant was a knowing and willing participant in this 'alleged fraud'. As such CPL 440.10 is not available to him." *People v. Leka,* Indict. 2520/1988 (N.Y. Sup.Ct., Kings County, Dec. 6, 1991) (corrected order denying § 440.10 motion at 9) (citation omitted). Similarly, if this court's theory of what actually happened is correct, petitioner has only himself to blame for the failure of both a viable alternative defense and his subsequent actual conflict of interest claim.[10]

**10.** The Leka and Cira families' attempts to manipulate the legal system from the inception of this case over ten years ago are evidenced by the succession of confessions and recantations they have presented throughout these proceedings. These efforts have rendered incredible Leka's current claim of innocence based on Zeni Cira's confession. Because there was no constitutional violation at any stage of the state proceedings, if Leka is truly innocent, there remains only one way by which he may possibly regain his freedom. Zeni Cira has openly and notoriously confessed that he committed the murder, that Leka played no role in it, and that he deeply regrets that his deceit has led to his brother-in-law's imprisonment. *See* Mike McAlary, *Blood Feud: Brothers Confess to Murder Another Man is Jailed For,* N.Y. Post, Apr. 18, 1991, at 3. " 'It is a terrible thing that happened to [Leka],' Zeni Cira said. 'He is the innocent man. It was us, the brothers Cira, who committed the murder. And for that we must pay.' " *Id.* If he indeed feels that way, Zeni Cira is free to contact the Kings County Dis-

**304**

## Conclusion

After due consideration of petitioner's additional arguments on the *Brady* issue, this court finds no error in its previous ruling that petitioner has not made a substantial showing of a denial of a constitutional right. Accordingly, petitioner's motion for a certificate of appealability is denied.

SO ORDERED.

trict Attorney, agree to waive his double jeopardy defense, *see Ricketts v. Adamson*, 483 U.S. 1, 10, 107 S.Ct. 2680, 2685–2686, 97 L.Ed.2d 1 (1987), and plead guilty to the murder of Rahman Ferati. Under those circumstances, the Governor of New York might well grant a pardon or commute Leka's sentence, assuming that Leka's denial of any advance knowledge of a plan to shoot Ferati can be credited at this point. Ironically, the aspect of Garcia's affidavit upon which petitioner now relies so heavily—that Garcia heard gunshots and then looked out his win-

dow and saw the car stop—undermines any claim that the shooter did not go to 1947 Ocean Avenue with the intention of killing Ferati and thus tends to discredit, at least to some degree, the notion that Leka was unaware of the purpose of the visit. (Similarly, to the extent that the statement in Garcia's affidavit suggests that the gunman in the car began shooting before Ferati did, the statement would also undermine Leka's aborted self-defense claim, as well as the self-defense claims made by Luftim and Zeni Cira in their respective confessions.)